# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**WALTER W. LACEY,**                                           Chapter 13
     Debtor                                            Case No. 10-19903-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**WALTER W. LACEY,**
     Plaintiff

v.                                                            Adv. P. No. 10-1249

**BAC HOME LOANS SERVICING, LP;**
**GMAC-RFC HOLDING COMPANY, LLC,**
**ORLANS MORAN PLLC, and THE BANK OF**
**NEW YORK MELLON TRUST COMPANY, N.A.,**
**and DARLENE MCCARTHY**
     Defendants

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment filed by the following defendants: "Bank of America, N.A. as successor by merger to BAC Home Loans Servicing, LP, GMAC-REF Holding Company, LLC, Orlans Moran PLLC, Bank of New York Mellon Trust Company, N.A, and Darlene McCarthy" (collectively, the "Defendants"),

through which the Defendants seek summary judgment in their favor with respect to all

counts of the First Amended Complaint (the "Complaint") filed by Walter W. Lacey (the

"Plaintiff" or the "Debtor").  The Court heard the Motion and the Plaintiff's Objection on

April 30, 2012.  The issue presented is whether the Defendants have established the absence

of any genuine issues of material fact entitling them to summary judgment pursuant to Fed.

R. Civ. P. 56(a), made applicable to this proceeding by Fed. R. Bankr. P. 7056.

## II. JURISDICTION

The Plaintiff alleged in his Complaint that this Court has jurisdiction pursuant to 28

U.S.C. § 1334[1] and that "[t]his is a core proceeding within the meaning of that statute [28

---

[1] Section 1334 of title 28 provides in pertinent part:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

*** 

(e) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--

> (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

> (2) over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

U.S.C. § 157(b)(2)(A)-(P)], and the court has jurisdiction to enter a final judgment." In the

alternative, the Plaintiff assented to entry of final judgment by the bankruptcy court in the

event the Court were to determine his claims to be non-core.

The Defendants, who have filed answers to the Complaint, denied that the Complaint

is a core proceeding and denied that the Court may hear and determine the Complaint

because the Plaintiff had no interest in the property when he filed his bankruptcy petition

by virtue of the prepetition foreclosure sale, which extinguished his equity of redemption.

They do not consent to the entry of a final judgment by this Court.

In a Memorandum dated October 27, 2011, the Court stated:

> The Court concludes that the Debtor's causes of action are not "core;" rather
> they are "related-to" the Debtor's bankruptcy case as resolution of the claims
> will have a conceivable impact on the bankruptcy estate. *See* <u>Boston Regional
> Med. Center, Inc. v. Reynolds (In re Boston Regional Med. Center, Inc.)</u>, 410
> F.3d 100 (1st Cir. 2005). A determination that the Debtor's causes of action
> are "related-to" the Debtor's bankruptcy case compels the conclusion that this
> Court has jurisdiction to submit proposed findings of fact and conclusion of
> law to the district court pursuant to 28 U.S.C. § 157(c)(1).

<u>Lacey v. BAC Home Loans Servicing LP. (In re Lacey)</u>, Adv. P. No. 10-1249, Slip op. at 12

(Bankr. D. Mass. Oct. 27, 2011) (footnotes omitted).[2] The Court added that its decision was

---

28 U.S.C. § 1334. The United States District Court for the District of Massachusetts has
referred "any and all cases arising under Title 11 United States Code and any and all
proceedings arising under Title 11 or arising in or related to a case under Title 11" to the
bankruptcy court for the District of Massachusetts pursuant to 28 U.S.C. § 157(a). *See*
LR, D. Mass. 201.

[2] For example, if this Court were to determine that the foreclosure sale was void,
the Debtor's equity of redemption would not be extinguished and his bankruptcy estate
would be augmented.

without prejudice to the filing by the Defendants of a motion to withdraw the reference or

a motion for abstention.  Id. at 21.  None of the Defendants elected to file either type of

motion.

As a result of the October 27, 2011 decision, the Court reiterates its conclusion that

the Complaint is related to the Debtor's bankruptcy case, see 28 U.S.C. 1334(b), as it does not

implicate any core matters enumerated in 28 U.S.C. § 157(b)(2).  None of the Plaintiff's

claims arise under title 11, nor do they arise in his case under title 11, and the Defendants

do not consent to the entry of final orders.  Accordingly, the Court shall submit its proposed

findings of fact and rulings of law to the United States District Court for the District of

Massachusetts for review pursuant to 28 U.S.C. § 157(c)(1) when all the proceedings relative

to the Plaintiff's claims are concluded in this Court.[3]  None of the Defendants have filed a

proof of claim in the Debtor's Chapter 13 case.  The Complaint is non-core and related to the

Debtor's bankruptcy case and all of the parties do not consent to the entry of a final order

by this Court, and, as a consequence, this Court will not be entering a final judgment in the

---

[3] Section 157(c)(1) provides:

A bankruptcy judge may hear a proceeding that is not a core proceeding
but that is otherwise related to a case under title 11. In such proceeding,
the bankruptcy judge shall submit proposed findings of fact and
conclusions of law to the district court, and any final order or judgment
shall be entered by the district judge after considering the bankruptcy
judge's proposed findings and conclusions and after reviewing de novo
those matters to which any party has timely and specifically objected.

28 U.S.C. § 157(c)(1).

adversary proceeding.   The Court concludes that the United States Supreme Court's decision in Stern v. Marshall, 546 U.S. __, 131 S.Ct. 2594 (2011), is not implicated in this proceeding.  This Court interprets Stern narrowly as directed by the majority decision. Id. at 2620.   Pursuant to Stern, bankruptcy courts are divested of authority to enter final judgments with respect to state law counterclaims that are not resolved in the process of ruling on proofs of claim.  Those circumstances are not present in this proceeding.

## III. PROCEDURAL BACKGROUND

The Debtor filed a Chapter 13 case on September 12, 2010.[4]  He commenced the above-captioned adversary proceeding one day later.[5]

On February 17, 2011, this Court entered a Memorandum and Order, denying the Plaintiff's Emergency Motion for Injunctive Relief.  In its Memorandum and Order, this

---

[4] The Court takes judicial notice that the Debtor previously filed a Chapter 13 case on November 19, 2001. See In re Mailman Steam Carpet Cleaning Corp., 196 F.3d 1, 8 (1st Cir. 1999).  In that case, he listed prepetition arrears to Fleet Mortgage Corp. in the sum of $12,000.  In his first Chapter 13 case, Washington Mutual Home Loans, Inc. filed a Motion for Relief from Stay, although at that time Fleet Mortgage Corp., as will be discussed below, had executed an assignment of the mortgage "and the note thereby secured" to FNMA.  Nevertheless, Washington Mutual Home Loans, Inc. alleged that it was the present holder of the note and mortgage.  It asserted that the outstanding balance under the note was $107,040.60, including $86,058.75 in principal, $4,126.64 in interest, $1,652.18 in escrow/impound advance, $259.47 in unpaid late charges, $30.00 in fees for payoff information, $14,563,56 in fees currently assessed, and attorneys's fees of $350, and that the Debtor had failed to make postpetition payments.  The Court took no action with respect to the Motion for Relief from Stay as the Debtor's case was dismissed for failure to make plan payments.

[5] The Court takes judicial notice that the Debtor and his spouse have each filed two Chapter 13 petitions and that between one or the other of them they had a Chapter 13 case pending almost continuously between November of 2001 and July of 2008.

Court found that, on September 13, 2010,  the debtor, Walter W. Lacey (the "Debtor" or the "Plaintiff"), filed a Verified Complaint against BAC Home Loans Servicing, LP ("BAC"),[6] GMAC-RFC Holding Company, LLC ("GMAC"), Orlans Moran PLLC ("Orlans Moran"), and The Bank of New York Mellon Trust Company, N.A., which contained no specified counts against the Defendants.  The Court further found that, although the Complaint contained generalized allegations that a prepetition foreclosure sale conducted on September 3, 2010, nine days before the filing of his Chapter 13 petition on September 12, 2010, with respect to the Debtor's residence located at 11 Mount Vernon Street, Charlestown, Massachusetts (the "Property") was improper, the Debtor had failed to satisfy his burden for the entry of an order enjoining any further action with respect to the foreclosure sale at which Darlene McCarthy[7] ("McCarthy") was the successful bidder, paid a deposit and executed a memorandum of sale.  The Court specifically found that the Plaintiff had failed to establish a likelihood of success on the merits of his original complaint because it did not contain separate counts, was poorly drafted and failed to set forth cognizable legal theories in support of his claims.

---

[6] The Plaintiff originally incorrectly identified the defendant as Bank of America Home Loans.  He amended the caption on January 27, 2011.  On September 1, 2011, Bank of America, N.A. successor by merger to BAC Home Loans Servicing, L.P., moved with the assent of the Debtor to be substituted as a defendant.  The Court shall refer to BAC, with the proviso that any proposed judgment will enter against or in favor of Bank of America.

[7] The Debtor did not name McCarthy as a defendant in this adversary proceeding.  On January 11, 2011, the Court allowed McCarthy to intervene as a defendant.

6

Approximately six months after the commencement of the adversary proceeding against the Defendants, the Plaintiff, on February 25, 2011, filed a First Amended Complaint (the "Complaint").  Prior to the filing of the Complaint, the Court, on January 10, 2011, at a hearing to consider the Plaintiff's Motion for Partial Judgment on the Pleadings, determined that the Plaintiff was entitled to an adequate and comprehensible accounting. The Defendants attached to their Memorandum in Support of Joint Motion to Dismiss, which was filed on April 26, 2011, an email from Caroline O. Driscoll, Esq. to Plaintiff's counsel to which she attached an accounting of the Debtor's loan, captioned "Acquisition Previous Servicer Payment History."  The accounting attached to the email was neither adequate nor comprehensible.  Indeed, some pages were barely legible.[8]

In his Complaint, the Plaintiff set forth nine causes of action as follows:  Count I - Wrongful Foreclosure; Count II - Promissory Estoppel; Count III - Chapter 93A; Count IV - RESPA; Count V - Fair Debt Collection Practices Act; Count VI - Deceit and Misrepresentation; Count VII - Negligence; Count VIII - Accounting; and Count IX - Infliction of Emotional Distress.

**IV. PROPOSED FINDINGS OF FACT**

A. <u>The Complaint</u>

In his Complaint, the Plaintiff alleged that he first acquired the Property, individually, in 1985.  At the time, he was employed at Massachusetts General Hospital as

---

[8] The Defendants attach the same payment history to their Statement of Material Facts in Support of Their Joint Motion for Summary Judgment.

a biomechanical engineer, and his spouse was working part-time, as she primarily was responsible for the care of the couple's four children and the Debtor's mother.

The Debtor executed a note in favor of Fleet Mortgage Corporation ("Fleet"), dated March 29, 1996, in the original principal amount of $113,000. On the same day he executed a mortgage to secure the note in favor of Fleet.

In 2002, the Debtor conveyed an interest in the Property to his wife, who did not execute the note or the mortgage. One year later, the Debtor's spouse was required to reduce her work schedule for unspecified reasons, and, as a result, the Debtor experienced difficulties making his monthly mortgage payments. Eventually, the Debtor's spouse filed a bankruptcy petition to prevent a foreclosure sale.[9] In her Chapter 13 case, she obtained confirmation of a Chapter 13 plan, but because the Debtor became ill and could not contribute to plan payments, the case was dismissed in 2008, only a few months before the completion of the plan.

In his Complaint, the Debtor further averred that the foreclosure was wrongful and to his great detriment because BAC never provided him with any information validating the amount it claimed was due. Additionally, the Debtor averred that he believed he was current with his payments until BAC refused to accept payments in February 2010.

The Debtor also averred that "[u]pon information and belief," BAC is the recipient of federal funds intended to benefit him, and individuals like him, who need to modify their

---

[9] The Court takes judicial notice that Marianne T. Miller-Lacey filed Case No. 02-13228-JNF on May 2, 2002, which was dismissed on June 13 2003. She filed Case No. 03-17891-WCH on September 19, 2003.

mortgages in order to remain in their homes.  He added that the Emergency Economic

Stabilization Act of 2008 was signed into law on October 3, 2008. In implementing the Act,

according to the Debtor, the United States Treasury instituted a number of programs,

"including the "Making Homes Affordable' Act, Capital Purchase Program, and Capital

Assistance Program, among others."  Pursuant to those plans, and the authority provided

by H.R. 1424 Title I Sec. 109-110, the Debtor alleged that the United States Treasury has

ordered as follows:

> Mortgage Foreclosure Mitigation: All recipients of capital investments under
> the Financial Stability Plan will be required to commit to participation in
> mortgage modification program [sic].

The Debtor further alleged that "[p]ursuant to the United States Department of the Treasury

Section 105(a)Troubled Asset Relief Program ("TARP") Report to Congress for the Period

April 1, 2009 to April 30, 2009. [sic] BAC, in fact, is a recipient of Federal TARP funds."

(footnote omitted).  According to the Debtor

> Upon information and belief, BAC is also one of several Residential Mortgage
> Servicers committed to the Home Affordable Modification program through
> a formal Participation Agreement with the United States of America.  As a
> recipient of TARP funds, and pursuant to the Participation Agreement, BAC
> is subject to the U.S. Treasury's modification program guidelines for the
> Making Home Affordable Program [sic]. Said guidelines, as promulgated on
> March 4, 2009, clearly require any foreclosure action … be temporarily
> suspended during the trial period, or while borrowers are considered for
> alternative foreclosure prevention options. In the event that the Home
> Affordable Modification or alternative foreclosure options fail, the foreclosure
> action may be resumed.

The Debtor alleged that the guidelines also require, in summary, the following:

> (A) A screening for borrowers who contact their lender for assistance even if

not in default;

(B) A Net Present Value (NPV) analysis, which, if positive, requires the offering of the Making Homes Affordable (HMA) [sic] Modification;

(C) If the NPV analysis does not qualify for the MHA program, the lender must seek alternative foreclosure prevention including alternative modification programs, deed-in-lieu, and short sales; and

(D) Borrowers in litigation can qualify for a modification without waiving legal rights in such litigation.

The Debtor also alleged that "[u]pon information and belief, one or more of the defendants in this action in fact have received millions of dollars in taxpayer funds, and pursuant to the U.S. Treasury regulations, their acceptance of same requires that they suspend all foreclosure operations against borrowers," such as himself, "until such time as the services, tests, and potential modification opportunities promulgated by the U.S. Treasury are provided to them." The Debtor concluded that he is among the class of people who have been provided rights by the U.S. Government under its contract with BAC.

The Plaintiff's Complaint, though better than his original complaint, is not a model of clarity. The Plaintiff, in formulating his requests for relief in nine counts, did not supplement or amend the allegations in his original complaint and failed to differentiate among the Defendants and their alleged misconduct. For example, although the Plaintiff alleged that he received promises that the foreclosure sale would be postponed, he did not identify which Defendant made the promises or when the promises were made, although he did allege contact with Orlans Moran and BAC. Additionally, the Debtor did not allege any misconduct, whatsoever, on the part of GMAC or McCarthy.

B. The Evidentiary Materials in Addition to the Complaint

10

The Defendants submitted a Statement of Material Facts in Support of Their Motion for Summary Judgment, on March 16, 2012, together with 14 exhibits, including the affidavit of  Calen Shureb, Esq., an attorney with the law firm of Orlans Moran to which 12 exhibits were attached, and the affidavit of Alejandra Silva, a Vice-President at Bank of America, N.A., which was not signed under penalties of perjury, to which three exhibits were attached.  On April 27, 2012, the Plaintiff filed his Statement of Undisputed Material Facts, referencing the Affirmation of Marianne Miller-Lacey, in which, among other things, she attested to the accuracy of the facts set forth in the Complaint.  The Plaintiff also referenced 11 exhibits, as well as the "Securitization Examination and Analysis of Mortgage Loan prepared by Jay Patterson, C.F.E. ("Patterson"), a forensic accountant and certified fraud examiner, to which 12 exhibits were attached.[10]

C. The Assignments of the Note and Mortgage

As noted above, on March 29, 1996, prior to the conveyance of an interest in the Property to his spouse, the Plaintiff refinanced a purchase money mortgage by obtaining a new mortgage loan from Fleet, in the amount of $113,000.  The note provided for fixed interest at the rate of 6.125% and a 15-year term.

Assignment #1

On December 8, 1998, Fleet executed an assignment mortgage "and the note thereby

---

[10] The Plaintiff's exhibits are unnumbered; the Plaintiff provided an index of exhibits to which the exhibits themselves were attached with references to page numbers only.  The Court was unable to identify exhibits numbered 7 and 11.

secured," to Federal National Mortgage Association ("FNMA").[11]  On January 4, 1999, the

mortgage assignment by Fleet to FNMA was recorded in the Suffolk Registry of Deeds at

Book 23294, Page 261.

<div align="center">Assignment #2 (Corrective)</div>

On September 20, 2004, an "Assignment of Mortgage *Corrective*" was executed by

Washington Mutual Bank, FA, as successor to Fleet.  Pursuant to the Corrective Assignment,

Washington Mutual purported to assign the Fleet mortgage "together with the Note or other

evidence of indebtedness"to "JP Morgan Chase Bank as Trustee [illegible] Residential

Funding Corporation."[12] This Assignment was not recorded until August 1, 2006 at the

Suffolk County Registry of Deeds at Book 40107, Page 56.  The Assignment provided in

capital letters:  "This assignment is meant to correct the assignment recorded on 1/4/99,

Book 23294, page 261, record to correct assignee name."

<div align="center">Assignment #3</div>

On November 24, 2009, FNMA, by Wilshire Funding Corporation ("Wilshire"), as its

attorney in fact, executed a Corporate Assignment of Mortgage/Deed of Trust, assigning

"[a]ll the beneficial interest under the certain Mortgage/Deed of Trust dated March 29, 1996

and executed by Walter W. Lacey" to the "The Bank of New York Mellon Trust Company,

National Association fka The Bank of New York Trust Company, N.A. as Successor to JP

---

[11] The note attached as Exhibit A to the Defendants' Statement of Material Facts
in Support of Their Joint Motion for Summary Judgment reflects no endorsements.

[12] The word "Corrective" was handwritten.

Morgan Chase Bank, National Association" ("BONY").[13]  The assignment also conveyed

"the note or notes therein described or referred to, the money due and to become due

thereon with interest, and all rights accrued or to accrue under this Mortgage/Deed of

Trust."  This Assignment was recorded on February 26, 2010 at the Suffolk County Registry

of Deeds at Book 46120, Page 63.  Kathy Anderson, Assistant Vice President of Wilshire,

executed the Assignment pursuant to a power of attorney ostensibly registered with the

Suffolk County Registry of Deeds.[14]

### Assignment #4 (Confirmatory)

On August 1, 2011, a "Confirmatory Assignment" was made by FNMA.  Kimberly

Sue Daley, Assistant Vice President of Bank of America N.A., as attorney in fact for FNMA,

executed the assignment which was recorded on September 2, 2011.  The assignment

specifically provided that FNMA assigned the mortgage to "The Bank of New York Mellon

Trust Company National Association FKA The Bank of New York Mellon Trust Company,

N.A. as successor to JP Morgan Chase Bank N.A. as Trustee POOLING AND SERVICE

AGREEMENT Dated as of January 1, 2005 Mortgage Asset-Backed Pass-Through

Certificates Series 2005-RP1" ("BONY as Trustee").[15]  It further provided:

---

[13] This assignment contained no reference to BONY as trustee under a Pooling
and Service Agreement.

[14] The Assignment was notarized by a notary commissioned in Oregon but
contained a reference to the "State of or County of Washington."

[15] Patterson concluded that the trust referenced in Assignment #4 was
Residential Asset Mortgage Produces 2005-RP1 Trust ("RAAC 2005-RP1") [sic].  He
concluded that Assignment #3 was invalid as the assignor did not have authority to

This assignment is to confirm the trustee information omitted on the assignment recorded with the Suffolk Registry of Deeds, BK 46120, PG 63 on 2/26/2010.

The Assignments are summarized in the following chart.

| Assignment # | Assignor | Assignee | Date Executed | Date Recorded | Comments |
|---|---|---|---|---|---|
| 1 | Fleet | FNMA | 12/8/98 | 1/4/99 | |
| 2 | Washington Mutual Bank, NA as successor to Fleet | JP Morgan Chase Bank as Trustee | 9/20/04 | 8/1/06 | "Corrective" |
| 3 | FNMA, by Wilshire Funding Corp, as its attorney in fact | The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as Successor to JP Morgan Chase Bank, National Association | 11/24/09 | 2/26/10 | This Assignment was in effect at the time of the foreclosure sale. |
| 4 | FNMA, by Bank of America, as its attorney in fact | The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as Successor to JP Morgan Chase Bank, National Association as Trustee POOLING AND SERVICE AGREEMENT Dated as of January 1, 2005 Mortgage Asset-Backed Pass-Through Certificates Series 2005-RP1 | 8/1/11 | 9/2/11 | "Confirmatory" This Assignment was executed after the foreclosure sale and after the Debtor filed his Chapter 13 case and after the filing of the Debtor's Amended Complaint |

---

assign the mortgage and that the assignment recorded on February 26, 2010 was well after the closing date of the RAAC 2005-RP1 Trust, adding that "[t]he strict rules of the trust indicate that all  mortgage loans are to be sold into the trust on or before the closing date.  It is practically impossible that this loan was sold into the trust on February 26, 2010." Nevertheless, he admitted that because the RAAC 2005-RP1 trust is a private placement trust, which is not required to register with the Security and Exchange Commission, his research "may not be accurate."

Although Patterson's report was not presented as evidence in the form of an affidavit, the Court notes that he opined the following with respect to the foregoing assignments:

> Assignment #3 breaks the chain of title. The assignor is FNMA however the last assignee on Assignment #2 was JP Morgan as Trustee.
>
> According to my research and analysis the unendorsed Note indicates the owner as Fleet Mortgage Company [sic]. The Mortgage chain is broken and according to the last assignee in Assignment #2 - owner is JP Morgan Chase Bank, as Trustee. There is no mention of the specific trust the JP Morgan Chase Bank is acting as trustee for.
>
> In order for the chain to be unbroken there would have to had been [sic] an assignment of mortgage from JP Morgan Chase Bank, as Trustee to FNMA between 06/01/06 and 02/21/10.

Because of the asserted break in the chain of assignments and the unendorsed note, as well as the numerous entities claiming "to own the loan," Patterson concluded that "the foreclosure sale was conducted by an entity that did not have an ownership interest in the loan."

Although Fleet assigned the mortgage to FNMA, it retained servicing rights.  On October 21, 2004, Washington Mutual Bank, FA, successor by merger to Fleet, transferred the servicing rights to Wilshire, evidenced by a letter to this Court in which it provided "official notification of the servicing transfer of . . . [the Debtor's] . . . mortgage loan from Washington Mutual Bank, FA to Wilshire Credit Corporation  effective October 21, 2004."

On September 12, 2006, Wilshire, responding to a request made by the Debtor, advised him of the amount required to pay his mortgage loan.  Wilshire stated that the

payoff amount was $96,759.79, subject to final verification and other conditions.

During the bankruptcy case of the Debtor's spouse, "JP Morgan Chase Bank, as Trustee by Residential Funding Corporation, through its servicing agent, Wilshire Credit Corporation," filed a Motion for Relief from the Automatic Stay on February 26, 2007, in which it alleged, in one paragraph, that the amount due as of the 2003 petition date was $56,143.84, and, in another paragraph, that the "total sum required … to pay off the Note in full [as of October 12, 2006] was $94,516.77."[16] As it was undisputed that there was substantial equity in the Property, the motion was denied, and neither the disparity in the alleged amounts owed nor JP Morgan Chase Bank's standing were resolved.  The Debtor's spouse's 2003 Chapter 13 case was dismissed on July 1, 2008.

On September 9, 2008, after the dismissal of the Debtor's spouse's Chapter 13 case, Wilshire sent a letter to the Plaintiff informing him that his account was past due in the amount of $36,094.79 plus late charges of $802.52 and that "[t]his arrearage constitutes a breach of your mortgage note obligation."  It further advised him that in the event that he

---

[16] The Court takes judicial notice that the movant alleged that the Debtor transferred his interest in the property to his spouse "without Wilshire's consent or notice."  The Court also takes judicial notice that the movant represented that "the total balance due Wilshire under the Note and Mortgage *as of the petition date* [September 19, 2003] was approximately $51,526.44 in principal, $3,382.15 in interest, and $1,309.70 in "accrued open charges."  According to the movant, *as of October 12, 2006*, over three years later, the total sum required to pay off the Note in full was $94,516.77 (i.e., $48,104.50 in principal; $831.45 in accrued interest; $21,829.74 in accrued open charges; $23,051.08 in escrow overdrafts (consisting of $20,182.08 in real estate taxes paid and $2,869.00 paid for insurance), and $700 in attorneys' fees and expenses.  Movant further represented that Walter Lacey had made no payments on the Note and Mortgage since August 1, 2006.

failed to pay the arrearage amount and future monthly payments and late charges by December 8, 2008, it had the right to accelerate the due date of the note and to take steps to terminate his ownership in the Property by a foreclosure action.  It identified the mortgage holder as Bank of New York Trust Company, N.A.  as successor to JP Morgan Chase Bank N.A. as Trustee, presumably in reliance on Assignment #2, as Assignment #3 was not executed until November 24, 2009.

On November 27, 2009, after Assignment #3, "The Bank of New York Mellon Trust Company National Association FKA The Bank of New York Trust Company, N.A. as successor to JP Morgan Chase Bank N.A. as Trustee," identifying itself as  the holder of the mortgage on the Property with the statutory power of sale, filed a Complaint to Foreclose Mortgage against the Debtor (and his spouse) in the Land Court, Department of the Trial Court,  pursuant to the Servicemembers Civil Relief Act.  In conjunction with its Complaint to Foreclose, it  executed and filed in the Land Court, "Mortgagee's Affidavit," pursuant to which it represented that it was authorized "to act by and on behalf of either the Mortgagee or one holding under the Mortgagee."  Judgment entered on March 30, 2010.

On February 1, 2010, "BAC Home Loans Servicing LP, a subsidiary of Bank of America, N.A.," sent a letter to Plaintiff advising him that, effective February 1, 2010,  it had succeeded Wilshire and assumed the servicing of his mortgage, "that is, the right to collect payments from you." On the same date it sent him an "Important Legal Notice" informing him that it was considered a debt collector under the Fair Debt Collections Practices Act and that the amount of his debt, as of February 1, 2010, was $116,348.59.  BAC also informed the

17

Plaintiff that "[t]he name of the creditor to whom the debt is owed:  GMAC-RFC SSID Z86."[17]  Additionally it stated:

> Unless you, within thirty (30) days after receipt of this letter, dispute the validity of the debt or any portion of the debt, BAC Home Loans will assume the amount to be valid.

> If you notify BAC Home Loans in writing, to the address provided below within the thirty (30) day period, that you dispute the debt, or any portion of the debt, BAC Home Loans will obtain verification of the debt and mail it to you.

On February 2, 2010, a copy of the Servicemembers Civil Relief Act notice was sent to the Debtor and his spouse advising them to file an answer to the complaint to foreclose mortgage held by BONY as Trustee by March 22, 2010. Additionally, on that date, the Land Court issued Orders of Notice for service, for recording and for publication in the *Boston Globe* or *Boston Herald*, returnable on March 22, 2010.  Julie Taylor Moran, Esq. of Orlans Moran caused the Order of Notice to be published in the *Boston Herald* on February 22, 2010.

On March 18, 2010, Orlans Moran sent the Plaintiff a letter advising him of the intention of BONY as Trustee to foreclose and attaching a copy of the "Mortgagee's Notice of Sale of Real Estate," setting forth a foreclosure sale date of April 9, 2010.  Additionally, on March 18, 2010, Orlans Moran requested the *Boston Herald* to publish the Mortgagee's Notice of Sale of Real Estate for three consecutive weeks:  March 19, 2010, March 26, 2010

---

[17] The Court observes that in its Answer to the Complaint,  GMAC stated: "GMAC notes, however that the proper creditor is listed as GMAC-RFC SEC (SSID162) POOL 576."  The relationship, if any, between BONY as Trustee and GMAC-RFC SEC (SSID162) POOL 576 has never been elucidated, although the Court presumes RFC refers to Residential Funding Corporation, which was referenced in Assignment #2.

and April 2, 2010.  On March 22, 2010, Orlans Moran filed the Return on Order of Notice, which was dated March 19, 2010[18] as well as the Affidavit as to Military Service. Additionally, a "Motion to Take the Bill for Confessed" was filed on March 22, 2010 and, as noted above, the Land Court entered judgment on March 30, 2010.  The foreclosure sale did not occur on April 9, 2010, however, but was continued by public proclamation upon the mortgaged premises to July 9, 2010.

While the foreclosure action was proceeding in the Land Court, the Debtor and his spouse jointly sent a letter to BAC, dated February 26, 2010, disputing the amount owed, advising BAC that they had sent a payment of $1,742 to Wilshire and $1,742 to BAC because of the delay in receipt of the February 1, 2010 letter.  They also stated:

> We believe the letter we received with the amount of outstanding debt is incorrect.  We have stated this to Wilshire in previous communications. At this time we are writing to dispute the amount noted on the enclosed statement.  We are also requesting the name + address of original creditor."

BAC never sent a verification of the amount owed to the Debtor.[19]

---

[18] The Bank of New York Mellon Trust Company, National Association FKA The Bank of New York Trust Company, N.A. as successor to JP Morgan Chase Bank N.A. as Trustee POOLING AND SERVICING AGREEMENT Dated as of January 1, 2005 Mortgage Asset-Backed Pass-Through Certificates Series 2005-RP1 c/o BAC Home Loans Servicing L.P. appointed Orlans Moran PLLC and each of its officers, directors, employees, agents and/or assigns its true and lawful attorney-in-fact for it  to conduct foreclosure proceedings, effective October 8, 2009.  The Power of Attorney was not dated but was notarized on June 3, 2010 in the State of Texas.

[19]  According to the Debtor in his Complaint, he and his spouse contacted BAC on numerous occasions thereafter in order to try to resolve the dispute. Various representatives of BAC gave them conflicting information, stating, for example, that the payoff amount of the loan was $195,000, and that the monthly payment on the mortgage was $5,000.  The Debtor found those statements to be incredible, given that the Note

On April 16, 2010, BAC informed the Plaintiff that he might be eligible for the Home Affordable Modification Program (the "HAMP program"). It provided a pre-paid envelope for financial documents in support of an application, adding "[w]e want to help you, so please consider this opportunity."  It also attached "general information" in the form of answers to "Frequently Asked Questions (FAQs),"a Checklist, a Request for Modification and Affidavit, and an IRS Form 4506-T - A Request for Transcript of Tax Return.  In the FAQs the following question and answer appeared:

> Q. Will a foreclosure occur if I participate in the Home Affordable Modification Program?
>
> As long as you comply with the terms of the Trial Period Plan, we will not start foreclosure proceedings. . . .
>
> If foreclosure proceedings started prior to you entering into the Home Affordable Modification Program Trial Period Plan, you will need to continue to respond to all notices while in the Trial Period Plan.  Not responding to any foreclosure notice could affect your legal rights.

The Plaintiff applied for a HAMP loan modification on May 1, 2010.  In the application, in a section captioned, "Hardship Affidavit," the Plaintiff's spouse stated: "Walter has been out of work since 2007.  He is on appeal for disability with social security office."[20]

---

had a fixed interest rate of 6.1%, a 15-year term, and a payment amount of $1,749.00. According to the Debtor, "BAC was not impressed by the obvious disparities between the information it apparently was provided by Wilshire and "reality as  the Debtor knew it to be."

[20] Pay stubs for the Debtor's spouse which were forwarded to BAC in conjunction with the Debtor's HAMP application reveal that her income was modest. Her year-to-date gross income, as of May 6, 2010, was $17,780.56; her year-to-date

On May 26, 2010, BAC's "Home Retention Division" sent the Debtor a letter, thanking him for his interest in HAMP, advising him that required documents were missing or contained incorrect information, and informing him that the missing or incomplete documents needed to be supplied by June 25, 2010.[21]

The foreclosure sale of the Property did not occur on July 9, 2010, but was again continued by public proclamation upon the mortgaged premises to July 29, 2010. On July 29, 2010, the sale again was postponed by public proclamation to August 13, 2010.

On August 4, 2010, just nine days before the scheduled foreclosure sale, BAC sent a letter to the Debtor in which the "Home Loan Team" thanked him for sending his financial documents to support the Home Affordable Modification Program loan modification eligibility review and advising him as follows:

> Within 30 days, you will hear from us about your eligibility for a loan modification. We will give you one of these three responses:
>
> - You are accepted into the program with instructions on how to proceed
>
> - You are declined from the program, *but we may*

---

taxable gross income was $13,622.46 and subject to taxes of $2,699.04 and deductions of $7,475.54, leaving year-to-date net pay of $7,605.98, a sum which would be insufficient to satisfy the monthly mortgage payment of approximately $1,749.

[21] In Defendants' Joint Opposition to Plaintiff's Motion for Preliminary Relief, the Defendants stated in ¶ 5 that Plaintiff did not provide BAC with the missing, required documentation and that, therefore, "BACHLS denied his HAMP application on July 13, 2010." The record is devoid of a letter with that date informing the Debtor of such denial. As set forth below, BAC sent the Debtor a letter, dated October 29, 2010 informing him that his HAMP loan modification application had been denied.

*have other options to help you avoid foreclosure*

● We need more information from you to make
our decision (emphasis supplied) . . . .

At the conclusion of the letter, BAC indicated that it would be "in touch soon." In his

Complaint, the Debtor stated that BAC never got "in touch" with him.

On August 13, 2010, the foreclosure sale was continued again by public proclamation

to September 3, 2010. On that date, BONY as Trustee sold the mortgaged premises at a

public auction conducted by Terryanne St. Pierre, a licensed auctioneer, associated with

Tache Auctions & Sales Inc., to Darlene McCarthy, the highest bidder, for $501,000.00. Nine

days later, on September 12, 2010, Plaintiff filed a Chapter 13 petition.

As required by the Massachusetts Division of Banks and pursuant to Mass. Gen.

Laws. ch. 244, §35A(f), Orlans Moran notified the Massachusetts Foreclosure Petition

Registry that the Property had been foreclosed. It identified the "loan holder" as "Bank of

New York Mellon."[22]

Following the foreclosure sale and the commencement of his Chapter 13 case, BAC,

seemingly oblivious to both events, sent the Plaintiff, on October 29, 2010, a letter informing

him that his HAMP application had been denied because it was incomplete and that his loan

was not eligible for the HAMP program. It further informed him that it was "currently

---

[22] The record establishes that The Bank of New York Mellon Trust Company,
National Association fka The Bank of New York Trust Company, N.A. as successor to
JP Morgan Chase Bank N.A. as Trustee Pooling and Servicing Agreement Dated as of
January 1, 2005 Mortgage Asset-Backed Pass-Through Certificates Series 2005-RPI and
McCarthy executed a "Foreclosure Auction Sale Agreement" and a Memorandum of
Terms and Conditions of Sale on September 3, 2010.

reviewing your financial information to determine if there are other options available to you," including a different modification program, a forbearance program, a short sale or a deed in lieu of foreclosure.  Additionally, it encouraged him to continue making the normal monthly payments required under his original loan documents to help avoid foreclosure, adding "[i]f a foreclosure proceeding or foreclosure sale of your home is currently pending and on hold, that hold will continue and remain in effect while you are considered for other home retention programs."

Although the Property was foreclosed prepetition, BAC continued to communicate with the Debtor.  On September 9, 2011, approximately one year after he filed his Chapter 13 case, it sent him an escrow analysis for his loan, stating "[t]he purpose of this notification is to advise you that the escrow portion of your payment is changing to $800.41 effective October 01, 2010."  Under "Additional Information," it set forth the following:

Principal balance                          $32,282.79
Home loan payment due 10/01/2011    $ 1,761.62

This informational notice is being sent to the following borrowers at address set forth above in reference to the Chapter 13 Bankruptcy file:  WALTER W LACEY

The Escrow Account Review provided that at the commencement of the Debtor's Chapter 13 case, there was a negative escrow balance of $73,153.89.

On October 3, 2011, BAC sent the Debtor a statement for information purposes.  It provided that as of October 3, 2011, the principal balance of the loan was $32,282.79 and that the escrow balance was $71,616.73.  BAC attached to the statement a payment coupon, which it advised the Debtor he could disregard "to the extent it conflicts with any order or

23

requirement of the Court." Under the heading "Outstanding Fee Summary," the Statement, while noting "FORECLOSURE" provided that "Total Outstanding Fees Unpaid" were $3,747.06."[23]

On October 4, 2011, So Shin, a Customer Relationship Manager at BAC, wrote to the Debtor. Mr. Shin advised him that he was the Debtor's "dedicated customer relationship manager" and that "Bank of America, N.A. has several programs designed to help homeowners who are having trouble making their monthly mortgage payment...." BAC, through Mr. Shin added "we know this is a difficult time, and we're here to help."

## V. DISCUSSION

A. <u>Summary Judgment Standard</u>[24]

In <u>Hammond v. JPMC Specialty Mortg. LLC</u>, No. 10-11121-DPW, 2011 WL 1463632 (D. Mass. April 15, 2011), the court articulated the summary judgment standard in the context of a challenge to the validity of a foreclosure sale, stating:

> A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. P. 56(a). If the moving party meets this burden, "the opposing party can then defeat the motion by showing that there is a genuine issue of material fact." <u>Rivera–Colon v. Mills</u>, __ F.3d __, 2011 WL 504049, at *2 (1st Cir. Feb.15, 2011). An issue is genuine

---

[23] Unless attorneys' fees and other charges exceeded $10,000, the principal balance and escrow balances do not add up to $116,348.59, the amount BAC alleged the Debtor owed on February 1, 2010, over 18 months earlier.

[24] Federal Rule of Civil Procedure 56 was amended, effective December 1, 2010. The substantive standard for summary judgment, however, remains unchanged. *See* <u>Tropigas de P.R. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 n.5 (1st Cir. 2011).

24

"if 'a reasonable jury could resolve the point in favor of the nonmoving party.'" Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, __ F.3d __, 2011 WL 834072, at *2 (1st Cir. Mar.11, 2011) (quoting McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 315 (1st Cir.1995)). A fact is material if "its existence or nonexistence has the potential to change the outcome of the suit." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir.2010).

Hammond, 2011 WL 1463632 at * 3.  The court in Hammond added:

> "In evaluating whether there is a genuine issue of material fact, the court examines the record—pleadings, affidavits, depositions, admissions, and answers to interrogatories—viewing the evidence in the light most favorable to the party opposing summary judgment." Id. (citations omitted). However, I may "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" Tropigas de P.R., Inc., 2011 WL 834072, at *2 (quoting Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)). Thus, in order to meet its burden, the nonmoving party "must point to competent evidence and specific facts." Tropigas de P.R., Inc., 2011 WL 834072, at *3 (citation omitted). . . .

2011 WL 1463632 at *3.  In other words, "[a]s to issues on which the nonmovant has the burden of proof, the movant need do no more than aver 'an absence of evidence to support the nonmoving party's case.'" Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 n.1 (1st Cir. 1994)(citation omitted).  "The burden of production then shifts to the nonmovant, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both genuine and material." Id. (citation and internal quotations omitted).

    B. Count I: Wrongful Foreclosure

        1. The Positions of the Parties

Through Count I and the "Wherefore" clause at the end of his Complaint, the Debtor seeks a determination that the foreclosure sale should be set aside and that the Defendants should be enjoined from any action to complete the allegedly wrongful foreclosure sale,

25

"such as by executing a Memorandum of Sale, a deed, or any other act of that nature."

Specifically, the Plaintiff seeks a determination 1) that the note was not in default at the time

of the foreclosure sale and the mortgage had not come due by its terms; 2) that, after the

commencement of foreclosure proceedings, he tendered regular monthly payments, which

the Defendants, in bad faith, refused to accept, forcing him into default; 3) that, during the

foreclosure process, he repeatedly requested an explanation of how the Defendants

determined that he was in default, but the Defendants refused to supply him with an

explanation or an accounting; 4) that he complied with the requirements for obtaining a

HAMP modification of his mortgage, but the Defendants conducted a foreclosure sale,

despite repeatedly promising to refrain from doing so while his loan modification

application was under review; and 5) that the auction was conducted by BONY as Trustee,

even though he received a letter (the February 1, 2010 letter) stating that GMAC-RFC SSID

Z 86 was the creditor to whom the debt was owed.

Defendants argue that they are entitled to summary judgment in their favor on Count

1 of the Complaint because at the time of the publication of the Notice of Foreclosure Sale:

1) the "Bank of New York Mellon held both the Note and Mortgage;" 2) the Plaintiff was in

default pursuant to the terms and conditions of both the note and mortgage; 3) the

foreclosure sale was conducted in accordance with Massachusetts foreclosure law; and 4)

the foreclosure sale was conducted in good faith and with due diligence. Specifically, they

assert that "[as] holder of both the Note and Mortgage, the Bank of New York Mellon,"

which it defined for purposes of their Memorandum as BONY as Trustee, "properly

26

conducted a foreclosure sale on the Property," adding the following.

> [T]he undisputed facts show that the Bank of New York Mellon, held a valid
> assignment as of both the Note and Mortgage [sic], well before the actual
> foreclosure sale. Both the Note and Mortgage were assigned to the Federal
> National Mortgage Association by assignment recorded on January 19, 1999.
> . . . . On November 24, 2009, the Federal National Mortgage Association, by
> Wilshire Funding Corporation as its attorney in fact, assigned all beneficial
> interest of both the Note and Mortgage to the Bank of New York Mellon. . . .
> . Finally, on August 1, 2011, a Confirmatory Assignment was executed by
> Bank of America, as attorney in fact for the Federal National Mortgage
> Association, confirming the November 24, 2009 assignment of the mortgage
> to the Bank of New York Mellon. . . .

> The fact that a Confirmatory Assignment was executed post foreclosure does
> not change this conclusion. The Supreme Judicial Court made clear in _Ibanez_
> that an assignment need not be in recordable form, let alone recorded, in
> order to convey the authority to foreclose. _Ibanez_ 458 Mass. at 651, 654
> (stating that they "do not suggest that an assignment must be in recordable
> form at the time of the notice of sale or the subsequent foreclosure sale" and
> that a "valid assignment of a mortgage gives the holder of that mortgage the
> statutory power to sell . . . regardless whether the assignment has been
> recorded"). The Confirmatory Assignment is "evidence" of the former
> assignment. _See_ _id._ at 654 (expressly endorsing procedure by which a
> confirmatory assignment of an earlier, unrecorded assignment is evidence of
> the prior, valid assignment).

   2. Applicable Law

In U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 646 (2011), the Supreme Judicial

Court of Massachusetts held that under Massachusetts law a foreclosure sale that does not

strictly comply with the statutory terms of Mass. Gen. Laws. ch. 244, § 14, is void (and not

merely voidable). _See also_ Bevilacqua v. Rodriguez, 460 Mass. 762, 778 (2011) ("Our recent

decision in the case of [Ibanez] . . . concluded that '[a]ny effort to foreclose by a party lacking

'jurisdiction and authority' to carry out a foreclosure under [the relevant] statutes is void.'").

When a foreclosure is void, the foreclosure is a legal nullity and the parties are returned to

the position they would have been in, but for the invalid foreclosure. *See* <u>Oum v. Wells Fargo, N.A.</u>, __F.Supp.2d __, 2012 WL 390271, at *5 (D.Mass. Feb. 8, 2012).

In <u>Akar v. Fed. Nat'l Mortg. Ass'n</u>, __ F.Supp.2d __, 2012 WL 538212 (D. Mass. Feb. 9, 2012), the United States District Court for the District of Massachusetts elaborated on the holding in <u>Ibanez</u>, succinctly stating the following:

> "Where a mortgage grants a mortgage holder the power of sale, . . . , it includes by reference the power of sale set out in G.L. c. 183, § 21, and further regulated by G.L. ch. 244, §§ 11–17C." <u>U.S. Bank Nat'l Ass'n v. Ibanez</u>, 458 Mass. 637, 646, 941 N.E.2d 40, 49 (2011). Pursuant to the statutory scheme,

>> after a mortgagor defaults in the performance of the underlying note, the mortgage holder may sell the property at a public auction and convey the property to the purchaser in fee simple, "and such sale shall forever bar the mortgagor and all persons claiming under him from all right and interest in the mortgaged premises, whether at law or in equity."

> <u>Id.</u> (quoting Mass. Gen. Laws ch. 183, § 21). Due to the "substantial power that the statutory scheme affords to a mortgage holder to foreclose without immediate judicial oversight," Massachusetts law requires that "'one who sells under a power [of sale] must follow strictly its terms. If he fails to do so there is no valid execution of the power, and the sale is wholly void.'" <u>Id.</u> at 646, 941 N.E.2d at 49–50 (quoting <u>Moore v. Dick</u>, 187 Mass. 207, 211, 72 N.E. 967, 968 (1905)) (alteration in original).

>> "One of the terms of the power of sale that must be strictly adhered to is the restriction on who is entitled to foreclose." <u>Id.</u> at 647, 941 N.E.2d at 50. Under Mass. Gen. Laws ch. 183, § 21, "[t]he 'statutory power of sale' can be exercised by 'the mortgagee or his executors, administrators, successors or assigns.'" <u>Id.</u> (quoting Mass. Gen. Laws. ch. 183, § 21).

> Similarly, under Mass. Gen. Laws ch. 244, § 14,

>> "[t]he mortgagee or person having his estate in the land mortgaged, or a person authorized by the power of sale, or the attorney duly authorized by a writing under seal, or the legal

28

> guardian or conservator of such mortgagee or person acting in the name of such mortgagee or person" is empowered to exercise the statutory power of sale. Any effort to foreclose by a party lacking "jurisdiction and authority" to carry out a foreclosure under these statutes is void.

Id. (quoting Mass. Gen. Laws ch. 244, § 14) (alteration in original). Thus, "only a present holder of the mortgage is authorized to foreclose on the mortgaged property[.]" Id. at 648, 941 N.E.2d at 50.

"A related statutory requirement that must be strictly adhered to in a foreclosure by power of sale is the notice requirement articulated in G.L. c. 244, § 14." Id. at 647, 941 N.E.2d at 50. Pursuant to that provision,

> "no sale under such power shall be effectual to foreclose a mortgage, unless, previous to such sale," advance notice of the foreclosure sale has been provided to the mortgagor, to other interested parties, and by publication in a newspaper published in the town where the mortgaged land lies or of general circulation in that town.

Id. (quoting Mass. Gen. Laws ch. 244, § 14). "*Because only a present holder of the mortgage is authorized to foreclose on the mortgaged property, and because the mortgagor is entitled to know who is foreclosing and selling the property," the holder of the mortgage must be identified in the notice of sale, and any failure to do so "may render . . . the foreclosure sale void."* Id. at 648, 941 N.E.2d at 50. The key, therefore, "is that the foreclosing entity must hold the mortgage at the time of the notice and sale in order accurately to identify itself as the present holder in the notice and in order to have the authority to foreclose under the power of sale. . . ." Id. at 651, 941 N.E.2d at 53.

Akar, 2012 WL 538212 at *10-11.

With respect to assignments, Massachusetts law requires that a foreclosing party have a valid assignment of the mortgage at the time of the notice of sale. Ibanez, 458 Mass. at 651.[25] It does not require the assignment to be "in recordable form" at that time. Id. With

---

[25] In Ibanez, the court stated:

respect to the validity of assignments, the court in <u>Rosa v. Mortg. Elec. Sys., Inc.</u>, 821

F.Supp.2d 423 (D. Mass. 2011), stated:

> Mortgage assignments must be documented and recording the assignment is preferred but not required. <u>U.S. Bank Nat'l Assoc. v. Ibanez</u>, 458 Mass. 637, 651, 941 N.E.2d 40, 53 (Mass.2011). The Massachusetts statute regarding mortgage assignments requires that the assignment be executed before a notary public, by a person purporting to hold a position such as vice president, secretary or assistant secretary of the entity that holds record title of the mortgage. Mass. Gen. L. ch. 183, § 54B (West 2010). Even if a signatory lacks authority, an assignment may still be binding under Massachusetts law if the signatory purported to be an officer of the entity holding title to the mortgage and the assignment was executed before a notary public. <u>Id.</u>; <u>Kiah</u>, 2011 WL 841282 at *7. Some jurisdictions require mortgagees, such as MERS, to prove both its nominee relationship with the note holder and the note holder's authorization of the mortgage assignment in order for an assignment to be valid. <u>In re Agard</u>, 444 B.R. at 250–251. However, "under Massachusetts law, an assignment of a mortgage is effective without the need to independently establish the authority of the assignor to make the assignment." <u>In re Marron</u>, 455 B.R. at 8 (citing <u>Aliberti</u>, 779 F.Supp.2d at

---

> We do not suggest that an assignment must be in recordable form at the time of the notice of sale or the subsequent foreclosure sale, although recording is likely the better practice. Where a pool of mortgages is assigned to a securitized trust, the executed agreement that assigns the pool of mortgages, with a schedule of the pooled mortgage loans that clearly and specifically identifies the mortgage at issue as among those assigned, may suffice to establish the trustee as the mortgage holder. However, there must be proof that the assignment was made by a party that itself held the mortgage.  A foreclosing entity may provide a complete chain of assignments linking it to the record holder of the mortgage, or a single assignment from the record holder of the mortgage. The key in either case is that the foreclosing entity must hold the mortgage at the time of the notice and sale in order accurately to identify itself as the present holder in the notice and in order to have the authority to foreclose under the power of sale (or the foreclosing entity must be one of the parties authorized to foreclose under G.L. c. 183, § 21, and G.L. c. 244, § 14).

458 Mass. at 651 (citations omitted).

248–49; <u>Kiah</u>, 2011 WL 841282 at *7). Since Massachusetts law does not require
a signatory to prove authority to execute a mortgage assignment, a mortgagee
need not prove authorization from the note holder to assign a mortgage.
<u>Aliberti</u>, 779 F.Supp.2d at 248–49; Kiah, 2011 WL 841282 at *7; <u>In re Marron</u>,
455 B.R. at *8. *But see* <u>In re Moreno</u>, 2010 WL 2106208 at *5 (a party seeking
relief from stay to foreclose on a mortgage must prove that an individual, as
an employee of a MERS member firm with limited authority to sign on behalf
of MERS, had authority to assign the mortgage). A mortgage assignment is
valid as long as it complies with the requirements of Mass. Gen. Laws. ch. 183,
§ 54B. <u>Aliberti</u>, 779 F.Supp.2d at 248–49; <u>Kiah</u>, 2011 WL 841282 at *7; <u>In re
Marron</u>, 455 B.R. at 8.

<u>Rosa.</u> 821 F.Supp.2d at 430.[26]

With respect to any claims predicated upon non-compliance with any pooling and

service agreement or "PSA," the court in <u>Juarez v. U.S. Bank Nat'l Assoc.</u>, No. 11-10318,

2011 WL 5330465 (D. Mass. Nov. 4, 2011), held that the mortgagor lacks standing to assert

such claims.  It observed:

> Although Defendants argue that Juarez, as mortgagor, has no standing to
> challenge the validity of the mortgage assignment based on the PSA because
> she is neither a party to nor third-party beneficiary of it, (Def. Memo at 11),
> Juarez makes clear in her opposition that she does not assert claims arising
> from the PSA on such grounds. (Pl. Opp. at 13). Rather, Juarez argues that
> <u>Ibanez</u> gives her standing on an independent basis to declare the mortgage
> assignment invalid based upon non-compliance with the terms of the PSA.
>
> The Court declines to extend <u>Ibanez</u> in the manner suggested by Juarez. . . .
> Whereas the <u>Ibanez</u> plaintiffs sought to demonstrate they held the mortgages
> through an assignment under securitization documents to which they were
> actual parties, here, Juarez is in a starkly different position; she is not a

---

[26] Pursuant to Mass. Gen. Laws ch. 183, § 54B, the notary public, justice of the
peace or other officer before whom an authorized individual may execute an
assignment must be "entitled by law to acknowledge instruments."  The Plaintiff did
not raise, and would most likely lack standing to raise, an issue as to the authority of the
Oregon notary who affixed her seal to Assignment #3 in the "State of or County of
Washington."

31

third-party beneficiary or party to the PSA she seeks to enforce. She therefore does not have a legally protected interest in the assignment of the mortgage to bring an action arising under the PSA. Ibanez does not provide independent standing for a plaintiff to challenge an assignment under a PSA to which she is not a party or of which she is not a third-party beneficiary. Most courts in this district to have addressed the issue agree, *see, e.g.*, Peterson v. GMAC Mortg., LLC, 2011 WL 5075613, at *2–4 (D.Mass. Oct.25, 2011) (declining to read Ibanez to "provide an independent basis for mortgagors to collaterally contest previously executed mortgage assignments to which they are not a party and that do not grant them any interests or rights"); In re Correria [sic], 452 B.R. 319, 324–25 (1st Cir.BAP June 30, 2011) (affirming lower court's ruling that mortgagors lacked standing to challenge the mortgage's chain of title under the PSA because they were neither parties nor third party beneficiaries to the contract), and at least one court in this district has expressed doubt concerning plaintiff's standing to challenge a mortgage assignment between third parties, Kiah, 2011 WL 841282, at *6 (stating that it is "difficult to see why plaintiff has standing to assert [challenge to mortgage assignment based on lack of consideration]"). Accordingly, Juarez has failed to state a plausible claim under Mass. Gen. L. c. 244, § 14 for Defendants' violation of the PSA.

2011 WL 5330465 at *4 (footnote omitted).

On June 22, 2012, while this decision was in draft, the Supreme Judicial Court issued a decision holding that the person or entity holding the mortgage must either hold the note or act on behalf of the note holder.  It stated:

A foreclosure sale conducted pursuant to a power of sale in a mortgage must comply with all applicable statutory provisions, including in particular G.L. c. 183, § 21, and G.L. c. 244, § 14. These statutes authorize a "mortgagee" to foreclose by sale pursuant to a power of sale in the mortgage, and require the "mortgagee" to provide notice and take other steps in connection with the sale. The meaning of the term "mortgagee" as used in the statutes is not free from ambiguity, but we now construe the term to refer to the person or entity then holding the mortgage and also either holding the mortgage note or acting on behalf of the note holder. Further, we exercise our discretion to treat the construction announced in this decision as a new interpretation of the relevant statute, only to apply to foreclosures under the power of sale where statutory notice is provided after the date of this decision.

32

Case 10-01249   Doc 264   Filed 07/12/12   Entered 07/12/12 14:27:19   Desc Main
Document   Page 33 of 91

Eaton v. Fed. Nat'l Mortg. Ass'n, 462 Mass. 569, __ N.E.2d __, 2012 WL 2349008 (June 22,

2012) (footnotes omitted).  The Supreme Judicial Court recognized that a mortgagee may

act as the agent of the note holder as principles of agency apply to its construction of the

term "'mortgagee'" in G.L. c. 244, § 14, to mean a mortgagee who also holds the underlying

mortgage note."  Id. at *8 and n.20.  It added:

> [W]e do not conclude that a foreclosing mortgagee must have physical
> possession of the mortgage note in order to effect a valid foreclosure.  There
> is no applicable statutory language suggesting that the Legislature intended
> to proscribe application of general agency principles in the context of
> mortgage foreclosure sales. Accordingly, we interpret G.L. c. 244, §§ 11– 17C
> (and particularly § 14), and G.L. c. 183, § 21, to permit one who, although not
> the note holder himself, acts as the authorized agent of the note holder, to
> stand "in the shoes" of the "mortgagee" as the term is used in these
> provisions.

Id. (footnotes omitted).[27]

The Court observes that the note executed by the Debtor attached as an exhibit to the

Defendants' Statement of Material Facts does not reflect any endorsements.  Although the

mortgage assignments refer to the note,  the note itself is a negotiable instrument, see Mass.

Gen. Laws ch. 106, §§ 3–301—3–312.   The Supreme Judicial Court indicated that it

---

[27] The court rejected decisions relying upon Mass. Gen. Laws ch. 244, § 14 to
support the position that a mortgagee need not have possession of the note in order to
foreclose, see Aliberti v. GMAC Mortg., LLC, 779 F.Supp.2d 242, 249 (D. Mass. 2011);
McKenna vs. Wells Fargo Bank, N.A., No. 10–10417–JLT,  2011 WL 1100160 (D. Mass.
Mar.21, 2011); Peterson vs. GMAC Mortg., LLC, No. 11–11115–RWZ, 2011 WL 5075613
(D. Mass. Oct. 25, 2011); Valerio v. U.S. Bank, N.A., 716 F.Supp.2d 124, 128 (D. Mass.
2010)(noting that G.L. c. 244, § 14, "is addressed to mortgagees, not note holders"),
because they failed to "analyze the term in the context of the broader statutory scheme
or against the backdrop of the common law"), Eaton, 2012 WL 2349008 at *8 n.21.

"perceive[d] nothing in the UCC inconsistent with our view that in order to effect a valid

foreclosure, a mortgagee must either hold the note or act on behalf of the note holder." Id.

at *8, n.26.

3. Discussion

a. Standing

In Peterson v. GMAC Mortg., LLC., No. 11-11115-RWZ, 2011 WL 5075613 (D. Mass.

Oct. 25, 2011), the court observed that "[w]hether Ibanez gives Massachusetts mortgagors

a legally protected interest in assignments to which they are not party, is apparently an open

question in the First Circuit."  2011 WL 5075613 at *3.  The court noted that at least one

district court decision suggested that Ibanez "seems to provide such standing."Rosa v.

Mortg. Elec. Sys., Inc., 2011 WL 4381191, at *3 n.5 (finding "Plaintiffs appear to have

standing under [Ibanez], because the allegations [regarding assignment validity], if proven,

would render the foreclosure sale void, under Massachusetts law."). The Peterson court,

however, cited cases rejecting that approach.  See, e.g., In re Correia, 452 B.R. 319, 324 (B.A.P.

1st Cir. 2011)(upholding lower court ruling finding non-party to mortgage assignment and

agreement authorizing assignment lacked standing to challenge the validity of assignment

based upon failure to follow assignment protocols set forth in the PSA); Kiah v. Aurora

Loan Servs., LLC, No. 10-40161-FDS, 2011 WL 841282 at *6 (D.Mass. March 4, 2011) (stating

"difficult to see why plaintiff has standing to assert [challenge to mortgage assignment]").

See also Wenzel v. Sand Canyon Corp., __ F.Supp.2d __, 2012 WL 219371 (D. Mass. Jan. 5,

2012).

34

This Court concludes that the Debtor has standing to challenge the validity of the foreclosure sale to the extent that there is an issue as to whether the entity conducting the foreclosure sale was the actual holder of the mortgage by way of assignment at the time of the notice and sale. *See* Ibanez, 458 Mass. at 651 ("there must be proof that the assignment was made by a party that itself held the mortgage . . . the foreclosing entity must hold the mortgage at the time of the notice and sale in order  accurately to identify itself as the present holder in the notice and in order to have authority to foreclose under the power of sale. . . . "). *See also* Bailey v. Wells Fargo Bank, NA (In re Bailey), 468 B.R. 464 (Bankr. D. Mass. 2012) (holding that the debtor had standing because her argument was not based on the breach of an underlying contract to which she was not a party; instead, her argument was aimed at the ownership of the mortgage at the time it was purportedly assigned).

The Court finds the conclusion reached by the court in Bailey is compelling.  The Debtor in this case is not challenging the assignments themselves; rather he is challenging the chain of assignments to advance his argument that the holder of the mortgage did not conduct the foreclosure sale.  To reject any argument which pertains to assignments out of hand would eviscerate the holding of Ibanez and deprive mortgagors of the most valuable remedy they have to protect their equity of redemption.  Thus, the Plaintiff has standing to establish defects in the chain of assignments affecting the validity of the foreclosure sale. A challenge to the foreclosure sale due to defects in the chain of assignments is readily distinguishable from a challenge to assignments based upon the provisions governing the executions of assignments in a PSA to which the mortgagors are not parties.  *See* In re Bailey,

35

468 B.R. at 475-76; *cf.* Drouin v. Am. Home Mortg. Servicing, Inc., No. 11-cv-596-JL, 2012 WL 1850967 at *3 (D. N.H. May 18, 2012).

b. The Assignments[28]

As a result of Assignment #1, FNMA held the mortgage and purportedly the note on and after December 8, 1998, although the assignment was not recorded until January 4, 1999. Contrary to Patterson's suggestion that Assignment #3 is outside the chain of assignments, the Court finds that Assignment #2 is outside the chain of assignments because between December 8, 1998 and November 24, 2009, FNMA was the holder of the note and mortgage. The assignment by "Washington Mutual Bank, FA [sic] successor to Fleet Mortgage Corp." to JP Morgan Chase Bank as Trustee was not "corrective" and did not effect a transfer of any interests in the mortgage because Fleet had previously conveyed its interests in the mortgage to FNMA. *See* Ibanez, 458 Mass. at 649 ("Like a sale of land itself, the assignment of a mortgage is a conveyance of an interest in land that requires a writing signed by the grantor.").

At the time of the foreclosure sale, the holder of the mortgage was BONY. According

---

[28] The Court finds that Patterson's "Securities Examination and Analysis of Mortgage Loan" is neither admissible nor probative with respect to the chain of assignments. Patterson did not execute his report under penalties of perjury and his conclusions are speculative and subject to serious doubt in view of his admission that some of his information may not be accurate. Moreover, he focused on the validity of the assignment vis à vis the terms of pooling and service agreements, which are not open to challenge by the Debtor pursuant to Peterson v. GMAC Mortg., LLC, 2011 WL 5075613 at *3-4.

to the Supreme Judicial Court, "[o]nly a present holder of the mortgage is authorized to foreclose on the mortgage property and because the mortgagor is entitled to know who is foreclosing and selling the property, the failure to identify the holder of the mortgage in the notice of sale may render the notice defective and the foreclosure sale void." Id. at 648. BONY, however, did not conduct the foreclosure sale, although Assignment #3 clearly identified it as the assignee of the mortgage ("[t]ogether with the note or notes therein described . . . ") from FNMA, by Wilshire, its attorney in fact; rather, BONY as Trustee was the entity which noticed and conducted the foreclosure sale. Cf. Braunstein v. Dexter (In re Aguilar), 450 B.R. 258 (B.A.P. 1st Cir. 2011)(holding that a conveyance of condominium units by debtors as trustees did not convey debtors' individual ownership interests in the units where the units had not been conveyed to the trust).

The Defendants ask this Court to ignore the distinction between BONY (The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as Successor to JP Morgan Chase Bank, National Association), the holder of the mortgage pursuant to Assignment #3 and BONY as Trustee (The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as Successor to JP Morgan Chase Bank as Trustee POOLING AND SERVICE AGREEMENT Dated as of January 1, 2005 Mortgage Asset Backed Pass-Through Certificates Series 2005-RP1), which was the entity identified as the present holder of the mortgage in the Mortgagee's Notice of Sale of Real Estate and the name of the assignee in Assigment #4. Essentially, they ask the Court to conflate the two entities and conclude that

the assignment to BONY is equivalent to an assignment to BONY as Trustee. The Court

cannot make that leap of logic for the following reasons.

Assignment #4, the Confirmatory Assignment, did not confirm anything, particularly

as Assignment #3 was clear and unambiguous. Just as Assignment #2 could not "correct"

the assignment from Fleet to FNMA by changing the identity of the assignee, Assignment

#4 could not and did not confirm Assignment #3 because a new assignment of the mortgage

from BONY to BONY as Trustee would have been necessary to convey the mortgage to

BONY as Trustee where FNMA had relinquished its interest in the mortgage when

Assignment #4 was executed. In other words, the Court concludes that the Defendants

failed to address, let alone convincingly establish for purposes of summary judgment, that

the so-called Confirmatory Assignment rectified what was omitted from Assignment #3 for

purposes of validating the foreclosure sale. To confirm an assignment connotes ratification

or the removal of doubt. *See* Webster's <u>New Collegiate Dictionary</u> 235 (1981). While

Assignment #4, the confirmatory assignment by FNMA to BONY as Trustee, may have

served some purpose as between the parties to it to correct the name of the assignee, it does

not alter the fact that there was no valid, written assignment in effect at the time of the

foreclosure notice and sale that correctly identified BONY as Trustee as the holder of the

mortgage, rather than BONY. Thus, the so-called confirmatory assignment was a belated

attempt to correct the name of the assignee not confirm it. If the omission of the words, "as

Trustee" were immaterial and of no consequence, the Court concludes the FNMA, by Bank

of America, its attorney in fact, would not have executed Assignment #4 after the

38

foreclosure sale and the commencement of the Debtor's Chapter 13 case.

Although the Supreme Judicial Court in <u>Ibanez</u> indicated that a defect in assignment could be resolved by the recording of a "confirmatory assignment," "[w]here an earlier assignment is not in recordable form or bears some defect," it emphasized that such a confirmatory assignment "cannot confirm an assignment that was not validly made earlier." <u>Ibanez</u>, 458 Mass. at 654. In the present case, Assignment #3 was in recordable form and was not defective on its face.[29] Put simply, the drafter of the Corporate Assignment of Mortgage/Deed of Trust (Assignment #3) referenced only BONY as the holder of the mortgage, not BONY as Trustee, an error that appears to have been overlooked until after the foreclosure sale, and after the commencement of the Debtor's Chapter 13 case and this adversary proceeding, when the Confirmatory Assignment was executed. In view of the Supreme Judicial Court's emphasis on strict adherence to statutory requirements under Mass. Gen. Laws ch. 244, § 14, this Court cannot conclude that BONY, unlike the other Defendants, satisfied its burden of establishing the absence of a genuine issue of material fact for purposes of entitling it to summary judgment on Count I. BONY as Trustee simply did not hold legal title to the mortgage on the date of the foreclosure notice and sale. *See* <u>Ibanez</u>, 458 Mass. at 649, 654 ("Like a sale of land itself, the assignment of a mortgage is a conveyance of an interest in land that requires a writing signed by the grantor . . . . Because an assignment of a mortgage is a transfer of legal title, it becomes effective with respect to

---

[29] There may or may not be an issue with respect to the notarization of the assignment by an Oregon notary in the "STATE OF OR COUNTY OF Washington."

the power of sale only on the transfer; it cannot become effective before the transfer. . . .").

*See also* Mass. Gen. Laws ch. 183, § 3 ("An estate or interest in land created without an

instrument in writing signed by the grantor or by his attorney shall have the force and effect

of an estate at will only, and no estate or interest in land shall be assigned, granted or

surrendered unless by such writing or by operation of law.").  Indeed, in view of the

absence of genuine issues of material fact as to the chain of assignment, the Court shall enter

judgment in favor of the Plaintiff pursuant to Fed. R. Civ. P. 56(f) in the absence of a timely

response from the Defendants.[30]

### c. The Debtor's Payment Defaults

Although the Court has determined that BONY is not entitled to summary judgment

on Count I based upon the failure to comply with the strictures of Massachusetts law set

forth in Ibanez, the Court shall address the Debtor's remaining responses the Defendants'

Motion for Summary Judgment.  In the first place, the Court finds that the Defendants

adduced significant evidence that the Debtor was in default under the terms of the note and

mortgage, and this Court has taken judicial notice of three prior bankruptcy cases filed by

---

[30] Fed. R. Civ. P. 56(f) provides:

After giving notice and a reasonable time to respond, the court may:

> (1) grant summary judgment for a nonmovant;
> (2) grant the motion on grounds not raised by a party; or
> (3) consider summary judgment on its own after identifying
> for the parties material facts that may not be genuinely in
> dispute.

Fed. R. Civ. P. 56(f), made applicable to this proceeding by Fed. R. Bankr. P. 7056.

the Debtor and his spouse.  Although the Debtor in his Complaint and in his memoranda

argued that he was not in default, his statements are conclusory and insufficiently probative

to establish a genuine issue of material fact as to the absence of a default, particularly where

his spouse listed mortgage arrearages in her Chapter 13 plan, for which she was not liable,

and she did not unequivocally represent that the Debtor was not in default under the terms

of the note and mortgage in her affirmation.

The Court finds that the burden shifted to the Debtor to defeat the Motion for

Summary Judgment with respect to his claim that the foreclosure was wrongful premised

upon the absence of a default at the time of foreclosure sale by producing evidence of

payments, both made and proffered.  Evidence in the form of the Debtor's admission that

his spouse filed a bankruptcy petition in 2003, which was dismissed in 2008 for failure to

make plan payments when he became ill, "the startling disparity in amounts [allegedly

owed which] was never resolved,"[31] as well as the Debtor's decision to pursue a loan

modification, regardless of the reasons advanced by the Debtor, compels the conclusion that

there were some payment defaults.  Accordingly, the Court finds that the Defendants are

entitled to summary judgment to the extent that the Debtor seeks to avoid the foreclosure

sale pursuant to Count I due to the absence of a default.  Accordingly, the Court finds that

the Defendants established the existence of payment defaults.  The Debtor's assertions that

---

[31] The Court notes that the "startling disparity" may have been the result of
approximately $29,000 allegedly owed by the Debtor in "accrued open charges," which
were not escrow overdrafts for real estate taxes and insurance.  The Court cannot
fathom the basis for those charges and apparently the Debtor has no idea  either.

he was not in default and that the Defendants caused him to default are unsupported and insufficient to withstand the Defendants' Motion for Summary Judgment on that ground.

### d. The Conduct of the Foreclosure Sale

"A mortgagee in executing a power of sale contained in a mortgage is bound to exercise good faith and put forth reasonable diligence." Sher v. South Shore Nat'l Bank, 360 Mass. 400, 401 (1971)(citations omitted). "This duty and obligation is available for the protection not only of the mortgagor but of those claiming in his right, including those holding junior encumbrances or liens." Id. at 401-402 (citing Sandler v. Silk, 292 Mass. 493, 496 (1935)). The Supreme Judicial Court has characterized the duty as requiring "effort and attention by the mortgagee to conduct the sale of the property fairly and in good faith through the observance of the procedural requirements of the statutes and the mortgage." Seppala & Aho Const. Co., Inc. v. Petersen, 373 Mass. 316, 326 (1977).

The Plaintiff alleged that scheduling a foreclosure sale while his loan modification application was pending, constituted bad faith and breach of the Defendants' duties to act in good faith and reasonable diligence. With respect to any claim by the Debtor that the foreclosure sale was wrongful because the  conduct of the sale did not satisfy the duty to exercise good faith and reasonable diligence, the Court, *assuming arguendo a sale by the holder of the mortgage*, finds that the Defendants sustained their burden of showing the absence of a genuine issue of material fact and are entitled to summary judgment with respect to the Debtor's claims that the sale was wrongful because of a defect in the manner of the notice and conduct of the sale which implicated the mortgagee's exercise of good faith and

42

reasonable diligence.  The burden shifted to the Debtor, who did not cogently point to any

defect in the statutorily prescribed procedural requirements with respect to the foreclosure

sale other than the foreclosure by an entity who did not hold the mortgage at the time of the

issuance of the foreclosure notice and sale.

<div align="center">e. Violation of HAMP Guidelines</div>

The Court rejects the Debtor's argument that the Defendants are not entitled to

summary judgment because of violations HAMP Guidelines and that those violations

establish a claim for wrongful foreclosure.[32]   The Debtor argues that a violation of HAMP

is evidence of bad faith which implicates the duty to exercise good faith and reasonable

diligence in the sale.  The Court rejects this argument.

Numerous courts in the First Circuit, including this Court, have determined that

plaintiffs  do not have a private right of action as a third party beneficiary for breach of the

HAMP Guidelines.  *See* Speleos v. BAC Home Loans Servicing., L.P., 755 F.Supp.2d 304 (D.

Mass. 2010).  In Speleos, the United States District Court for the District of Massachusetts

considered breach of contract claims by a borrower against a lender, BAC Home Loans

Servicing, L.P., that arose under circumstances that were virtually identical to those present

in the instant case.  The court, in soundly rejecting the borrowers claims, stated:

> Most federal courts which have addressed that question have held that a
> borrower does not have standing under HAMP to bring a third-party
> beneficiary claim. *See, e.g.*, Zeller v. Aurora Loan Servs., LLC, No, 3:10cv00044,

---

[32] The Court takes judicial notice that BAC participates in the HAMP program.
*See* In re Bank of Am. Home Affordable Modification (HAMP) Contract Litig., No. 10-
md-02193-RWZ, 2011 WL 2637222 (D. Mass. July 6, 2011).

2010 WL 3219134, at *1, 2010 U.S. Dist. LEXIS 80449, at *2 (W.D.Va. Aug. 10, 2010); Zendejas v. GMAC Wholesale Mortg. Corp., No. 1:10–CVV–00184 OWW GSA, 2010 WL 2490975, 2010 U.S. Dist. LEXIS 59793 (E.D.Cal. June 16, 2010). Additionally, in a recent case in the District of Massachusetts, Magistrate Judge Judith Dein dismissed a borrower's third-party breach of contract claim because he was not an intended third-party beneficiary of the HAMP Servicer Agreement between his servicer and Fannie Mae. McKensi v. Bank of Am., N.A., No. 09–11940–JGD, 2010 WL 3781841, at *5–6, 2010 U.S. Dist. LEXIS 99540, at *14–15 (D. Mass. Sept. 22, 2010). At least one federal court has held to the contrary, however. Marques v. Wells Fargo Home Mortg., Inc., No. 09–cv–1985–L, 2010 WL 3212131, at *7, 2010 U.S. Dist. LEXIS 81879, at *19 (S.D. Cal. Aug. 12, 2010).

Neither the HAMP Guidelines nor the Servicer Agreement states any intent to give borrowers a right to enforce a servicer's obligations under the HAMP Guidelines. Marks v. Bank of Am., No. 10–8039, 2010 WL 2572988, at *4, 2010 U.S. Dist. LEXIS 61489, at *11 (D. Ariz. June 22, 2010). Thus, section 313(2)(a) of the Restatement (Second) of Contracts is inapplicable and the Court will analyze the Plaintiffs' claim under section 313(2)(b). Section 313(2)(b) requires a showing that the Plaintiffs were intended to benefit from the contract and that third-party beneficiary claims are consistent with the terms of the contract and the policy underlying it.

Speleos, at 308.  See also Brown v. Bank of Am. Corp., No. 10-11085, 2011 WL 1311278 at *2

(D. Mass. Mar. 31, 2011).   Nevertheless, courts in the District of Massachusetts have

determined that "[a] violation of HAMP that is unfair and deceptive in and of itself could

. . . create a viable claim under Chapter 93A even though HAMP does not provide a private

cause of action." See Kozaryn v. Ocwen Loan Serv., LLC, 784 F.Supp.2d 100, 102 (D. Mass.

2011).  In Kozaryn, the court stated:

The issue in this case is whether the alleged violation of HAMP is unfair and deceptive in and of itself. Plaintiff alleges that, despite the completed loan modification application and supporting financial documentation she provided, Ocwen failed to evaluate her application and instead sent her a loan modification denial letter stating that her "financial details" were missing.

Even if defendant's actions constituted a violation of HAMP, and it is unclear

44

whether they did, plaintiff must plead (and later prove) not only that the
HAMP guidelines were violated but also that Ocwen's actions were unfair or
deceptive. *See* Morris, __ F.Supp.2d at __, 2011 WL 1226974 at *6. Indeed, "not
every technical violation of HAMP should expose a servicer to Chapter 93A
liability." Id. at __, at *7. Plaintiff alleges that Ocwen failed to evaluate her
HAMP application despite the fact that Ocwen sent her a loan modification
denial letter in response. Without further factual detail demonstrating
unfairness, as opposed to clerical error or mere negligence, her claim for a
violation of Chapter 93A cannot be sustained. *See* id.; Brown v. Bank of
America Corp., 2011 WL 1311278, *3 (D. Mass. March 31, 2011) (citing Baena
v. KPMG LLP, 453 F.3d 1, 3 (1st Cir.2006)).

Kozaryn, 784 F.Supp. 2d at 103.  *See also* Okoye v. Bank of New York Mellon, No. 10-11563-

DPW, 2011 WL 3269686 at *8 (D. Mass. July 28, 2011); Blackwood v. Wells Fargo Bank, N.A.,

No. 10–10438–JGD, 2011 WL 1561024, at *4 (D. Mass. Apr. 22, 2011); Ording v. BAC Home

Loans Servicing, LP, No. 10–10670, 2011 WL 99016, at *6 (D.Mass. Jan. 10, 2011); Durmic v.

J.P. Morgan Chase Bank, NA, No. 10–cv–10380, 2010 WL 4825632, at *6 (D. Mass. Nov. 24,

2010).  In Okoye, the court, following a review of decisions addressing Chapter 93A claims

for HAMP violations, concluded that courts generally have adopted a three-part test,

requiring the plaintiff to allege 1) that plaintiffs have adequately pled that the defendant

violated HAMP; 2) that those violations would be independently actionable under Chapter

93A as unfair and deceptive, even absent the statutory provisions; and 3) if the conduct is

actionable, any Chapter 93A recovery would be compatible with the objectives and

enforcement mechanisms of HAMP.  Okoye, 2011 WL 3269686 at *8 (citing Morris v. BAC

Home Loans Servicing, L.P., 775 F.Supp.2d 255, 259-60 (D. Mass. 2011); Ording, 2011 WL

99016, at *7, and  Whitehall Co. Ltd. v. Merrimack Valley Distrib. Co., Inc., 56 Mass. App.

Ct. 853, 780 N.E.2d 479, 483 ( Mass. App. Ct. 2002)).

The Defendants are entitled to summary judgment on Count I to the extent that the Debtor seeks to avoid the foreclosure sale solely on the grounds of a HAMP violation. To the extent that the Debtor could have developed evidence of a HAMP violation, Count III, which sets forth the Debtor's claims under ch. 93A, is the appropriate vehicle to address such violation under applicable law in Massachusetts. As discussed below, Count III fails for lack of a written demand prior to the commencement of litigation.

In sum, the Court shall recommend the entry of an order granting the Defendants' Motion for Summary Judgment on Count I, with one critical exception: The Court recommends denial of the Motion for Summary Judgment under Count I as to BONY because BONY as Trustee, an entity which did not hold the mortgage at the time of the notice of sale and the foreclosure sale, was identified in the notice of sale and conducted the sale in violation of Mass. Gen. Laws ch. 244, § 14 and the holding in Ibanez.

C. Count II: Promissory Estoppel

    1. Positions of the Parties

The Debtor alleges that the Defendants "repeatedly promised to refrain from foreclosing" and that the Defendants represented that the foreclosure sale would be postponed while his HAMP application was being processed. He adds that the Defendants did so "with the intention of inducing his reliance on that representation" and that as a result he did not seek legal counsel or commence a bankruptcy case or other proceeding to stop the foreclosure sale, resulting in the loss of his equity of redemption. The Debtor references the August 4, 2010 letter in which BAC informed him that it would "be in touch"

within 30 days.  The Plaintiff did not provide any other information about when and by whom the promises to postpone the foreclosure sale were made.

The Defendants argue that they never represented that they would postpone the foreclosure sale.  Indeed, they state:

> No evidence exists that would suggest that the Defendants agreed to postpone the foreclosure sale that was scheduled for September 3, 2010. Moreover, no evidence exists showing that the Plaintiff detrimentally relied upon any representations made by Bank of America regarding the September 3, 2010 foreclosure sale. As a result, Plaintiff's claim for Promissory Estoppel fails and the Court should enter judgment in favor of the Defendants on Count II of the Plaintiff's First Amended Complaint.

They add:

> Plaintiff received a Notice of Foreclosure on March 18, 2010. . . . Bank of America's subsequent written correspondence with Plaintiff regarding HAMP does not contain any offers to postpone the foreclosure sale. . . . *The correspondence clearly states that Plaintiff was obligated to respond to foreclosure notices.*  Moreover, no representations were made to the Plaintiff by any of the Defendants that the foreclosure sale conducted on September 3, 2010 was going to be postponed. As such, there is no evidence that Bank of America, or any of the Defendants, induced Plaintiff to forgo steps to cure his default. Even if a promise were made, any alleged promise, at least based upon the documentary evidence provided, is "too indefinite to form an agreement binding upon the parties" and cannot form the basis for the imposition of promissory estoppel. <u>Aretakis v. Signal, Inc.</u>, 2006 WL 1581781, * 7 (D. Mass. June 7, 2006). As such, the Plaintiff could not have reasonably relied to his detriment on any alleged unwritten promise.[33]

---

[33] As noted above, in the FAQs attached to the April 16, 2010 letter from BAC to the Debtor, BAC advised the Debtor as follows:

> [I]f foreclosure proceedings started prior to you entering into the Home Affordable Modification Program Trial Period Plan, you will need to continue to respond to all notices while in the Trial Period.  Not responding to any foreclosure notice could affect your legal rights.

(emphasis supplied).  The Defendants also maintain the claim is barred by the Statute of Frauds, *see* Mass. Gen. Laws ch. 259, § 1.

In response, the Debtor relies upon Marianne Miller-Lacey's affirmation  in which she stated that various representatives of BAC assured her during telephone calls that the foreclosure sale would be postposted while the HAMP application was pending. He adds that because both he and his spouse previously had filed bankruptcy cases, they would have filed another bankruptcy case had they not been assured that no foreclosure sale would take place.

### 2. Applicable Law

In Veranda Beach Club Ltd. P'ship v. Western Sur. Co., 936 F.2d 1364, 1380 (1st Cir.1991),  the court observed:  "Under the doctrine of promissory estoppel in Massachusetts, " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " Id. at 1380 (quoting McAndrew v. School Comm. of Cambridge, 20 Mass.App.Ct. 356, 480 N.E.2d 327, 332 (Mass.1985)). *See also* Steinke v. Sungard Fin. Sys., Inc., 121 F.3d 763 (1st Cir. 1997); Restatement (Second) of Contracts § 90.[34]

---

The letter itself did not clearly state that the Plaintiff was obligated to respond to all notices.  The information was set forth in the FAQs and was not highlighted or emphasized in any way.

[34] In Tharpe v. Cisco Sys., Inc., No. 07-12279, 2008 WL 687416 (D. Mass. Feb. 14, 2008), the court observed that  "[u]nder Massachusetts law, an action based on reliance, such as promissory estoppel, 'is equivalent to a contract action, and the party bringing

In <u>Dixon v. Wells Fargo Bank, N.A.</u>, 798 F.Supp.2d 336 (D. Mass. 2011), the court thoroughly explored the doctrine of promissory estoppel, examining its genesis and evolution, in the context of a case in which the plaintiffs were seeking both to enjoin a foreclosure sale and obtain specific performance of an oral agreement to enter into a loan modification, as well as damages. In <u>Dixon</u>, the plaintiffs were induced to default on their mortgage payments in reliance upon a promise by Wells Fargo to negotiate a loan modification agreement.   The court held that the plaintiffs' complaint stated a cause of action for promissory estoppel, stating:

> Wells Fargo promised to engage in negotiating a loan modification if the Dixons defaulted on their payments and provided certain financial information, and they did so in reasonable reliance on that promise, only to learn that the bank had taken advantage of their default status by initiating foreclosure proceedings. Assuming they can prove these allegations by a preponderance of the evidence, their damages appropriately will be confined to the value of their expenditures in reliance on Wells Fargo's promise.

798 F.Supp.2d at 348 (footnote omitted).   In a footnote, the court observed that it need not decide the measurement of the plaintiffs' damages, although it noted that "[a] balancing of the equities . . . would seem to weigh in favor of limiting recovery to the detriment sustained" and that returning the plaintiffs' loan to its non-default status would put them back in their previous position.  <u>Id.</u> at n 2.

The Court in <u>Dixon</u> recognized that Massachusetts law is equivocal on the issue of when to apply promissory estoppel. While noting that courts in Massachusetts have not

---

such an action must prove all the necessary elements of a contract other than consideration.'"<u>Id.</u> at *2 (footnotes omitted, citation omitted).

formally adopted promissory estoppel as more than a substitute for consideration, id. at 343, it also noted that their adoption of § 90 of the Restatement (Second) of Contracts created a tension between two standards. Id. at 343-44.  The Dixon court observed:

> Tracing the development of promissory estoppel through the case law reveals a willingness on courts' part to enforce even an indefinite promise made during preliminary negotiations where the facts suggest that the promisor's words or conduct were designed to take advantage of the promisee. The promisor need not have acted fraudulently, deceitfully, or in bad faith. McLearn v. Hill, 276 Mass. 519, 524–25 (1931). Rather, "[f]acts falling short of these elements may constitute conduct contrary to general principles of fair dealing and to the good conscience which ought to actuate individuals and which it is the design of courts to enforce." Id. at 524.

Id. at 344.  The court added:

> Typically, where the Massachusetts courts have applied the doctrine of promissory estoppel to enforce an otherwise unenforceable promise, "there has been a pattern of conduct by one side which has dangled the other side on a string."

Id. (citing, inter alia,  Pappas Indus. Parks, Inc. v. Psarros, 24 Mass.App.Ct. 596, 598 (1987)).

The court in Dixon recognized that aside from three Massachusetts federal district court cases, see In re Bank of Am. Home Affordable Modification Program Contract Litig., No. 10-md-02193, RWZ, 2011 WL 2637222 (D. Mass. July 6, 2011); Bosque v. Wells Fargo Bank, N.A., 762 F.Supp.2d 342, 351 (D. Mass. 2011); and Durmic v. J.P. Morgan Chase Bank, NA, No. 10-cv-1038-, 2010 WL 4825632 (D. Mass. Nov. 24, 2010)(all three cases involved plaintiffs who entered into temporary trial modifications of their loans known as Temporary Period Plans (TPP), complied with the terms and payments of the TPP, and then were denied or did not receive permanent HAMP modifications), "virtually no other courts have

50

upheld a claim for promissory estoppel" premised on the similar facts as those existing in

the case.  Dixon, 798 F.Supp.2d at 349-50 and n.4.

    3. Analysis

    The Court finds that there are no issues of material fact that would preclude the entry

of summary judgment in favor of all the Defendants with respect to Count II, *except BAC*.

Based upon the undisputed facts, the only Defendant who could be liable to the Debtor

under Count II is BAC.   With respect to BAC, in its August 4, 2010 letter to the Plaintiff, it

indicated that it would provide him with one of three responses within 30 days: acceptance

into the HAMP program; non-acceptance into the program, or a request for additional

information. The second response ("You are declined from the program, but we may have

other options to help you avoid foreclosure"), was strongly suggestive that a foreclosure

sale would not take place until such time as the Debtor was provided with a response

within 30 days of August 4, 2010, namely September 3, 2010, the very day BONY as Trustee

purported to conduct a valid foreclosure sale.  Although the letter did not contain any

express promises to postpone the foreclosure sale itself, and although the FAQs attached to

its April 16, 2010 letter warned the Debtor that BAC was not obligated to postpone a

previously scheduled foreclosure sale, it was implicit in the letter and foreseeable that the

Plaintiff would "grab the lifeline" - - "the dangled string" - - and rely upon the August 4,

2010 letter and await developments, rather than commencing a bankruptcy case to avoid

the foreclosure sale.   Although BAC did not unconditionally promise to postpone the

foreclosure sale, no reasonable person would have read the letter and conclude that the

foreclosure sale would proceed on September 3, 2010 as there was no hint that on the 30th

day BONY as Trustee would foreclose in view of BAC's representation that it "would be in

touch soon." Moreover, the Plaintiff established that he relied upon those promises by not

filing a bankruptcy petition to stop the foreclosure sale. *Cf.* Akar v. Fed. Nat'l Mortg. Ass'n,

__ F.2d __, 2012 WL 661458 (D. Mass. Feb. 8, 2012) at * 15 (finding oral promises to postpone

foreclosure stated a claim for promissory estoppel where the plaintiffs alleged that Akar

relied on those promises by not seeking other potential ways to prevent or delay the

foreclosure, such as filing for bankruptcy).

The Court finds that genuine issues of material fact exist with respect to Count II

regarding BAC's conduct. *See* Ramirez v. Wells Fargo Bank, N.A., No. C 10-05874, 2011 WL

1585075 (N.D. Ca. April 27, 2011). The August 4, 2010 letter contains the unequivocal

statement that the Debtor was being considered for a loan modification. That letter, coupled

with the continuance of the foreclosure sale from the original April 9, 2010 date, and verbal

promises the Debtor was receiving from BAC, supports the Plaintiff's claim that the

foreclosure sale would be continued until his HAMP application was fully considered

within 30 days of August 4, 2010. The Court concludes that the Plaintiff should be afforded

an opportunity to develop that claim, although, consistent with the holding in Dixon, his

damages, if any can be proved, will be limited "to the value of [his] expenditures in reliance

on . . . [any] promise." 798 F.Supp.2d at 348. Those damages the court suggested could be

measured by the detriment sustained. Id. at 348 n.2.

The Statute of Frauds does not bar the Plaintiff's claim in view of the August 4, 2010

letter.  *See* Hurwitz v. Prime Commc'ns, Inc., 2 Mass. L. Rptr. 74, 1994 WL 561834 (Mass.

Super. April 4, 1994).   In that case, the Massachusetts court considered claims for

misrepresentation and promissory estoppel, finding that Massachusetts law recognized that

actions taken in reliance upon a material misrepresentation may estop a party from raising

a statute of frauds defense.  Id. at *5.  Nevertheless, it observed:

> The Restatement (Second) on Contracts describes promissory estoppel as
> follows:
>
> > 1) A promise which the promisor should reasonably expect to
> > induce action or forbearance on the part of the promisee or a
> > third person and which does induce such action or forbearance
> > is binding if injustice can be avoided only by enforcement of the
> > promise. The remedy granted for breach may be limited as
> > justice requires.
>
> Restatement (Second) on Contracts, § 90.  It is therefore clear, that the doctrine
> of promissory [estoppel] is recognized as an exception to the Statute of Frauds
> in the Commonwealth.

Hurwitz, 1994 WL 561834 at *3.

In view of the contours of promissory estoppel set forth above, the Court shall

recommend that summary judgment be granted in favor of all the Defendants except BAC.

D. Count III: Violation of Mass. Gen. Laws ch. 93A

1. The Positions of the Parties

With respect to the Debtor's Chapter 93A Count, the Defendants maintain they are

entitled to summary judgment because the Debtor never sent a written demand to them.

The Debtor asserts, however, that his original complaint can serve as a written demand for

relief, relying upon York v. Sullivan, 369 Mass. 157 (1975), and Hart v. GMAC Mortg. Corp.

(In re Hart), 246 B.R. 709 (Bankr. D. Mass. 2000).


2. Applicable Law

In order to prevail on a claim pursuant to Mass. Gen. Laws. ch. 93A, the Plaintiff must show that the Defendants engaged in unfair "methods of competition and unfair or deceptive acts or practices in business transactions." Mass. Gen. Laws ch. 93A, § 2. The Plaintiff must also establish compliance with a jurisdictional prerequisite, namely a written demand for relief.  Mass. Gen. Laws ch. 93A, § 9 provides in relevant part the following:

> (1) Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D *may bring an action in the superior court, or in the housing court* as provided in section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

> ***

> (3) At least thirty days prior to the filing of any *such action*, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. . . . The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. . . .

Mass. Gen. Laws ch. 93A, § 9 (emphasis supplied).

### 3. Discussion

The Debtor did not send a written demand to any of the Defendants as required by

Mass. Gen. Laws ch. 93A, § 9(3) before filing his original complaint or the Complaint now

before the Court, and the Defendants, accordingly, are entitled to summary judgment on

Count III. This Court finds that the cases cited by the Debtor involve circumstances that are

distinguishable from the facts in the instant case. Section 9(3) of ch. 93A requires that the

demand for relief precede the commencement of an "action," a reference to the

commencement of a lawsuit. As the Defendants correctly argue:

> [Massachusetts] [c]ourts have routinely held that a '"demand letter listing the specific deceptive practices claimed as a prerequisite to suit and as a special element that must be alleged and proved.'" <u>Spring v. Geriatric Auth. of Holyoke</u>, 394 Mass. 274, 287 (1985). Where there is no evidence "that the [demand] letter had been sent, received, or replied to," the Plaintiff's Chapter 93A claim must fail. <u>Lingis v. Waisbren</u>, 75 Mass. App. Ct. 464, 469 (2009). "The twin reasons for the demand letter are, first, to encourage negotiation and settlement, and second, to control the amount of damages recoverable by the plaintiff." <u>Thorpe v. Mut. of Omaha Ins. Co.</u>, 984 F.2d 541, 544 (1st Cir. 1993). The demand letter must describe the complained-of acts with reasonable specificity. <u>Piccuirro v. Gaitenby</u>, 20 Mass. App. Ct. 286, 291-292 (1985). Accordingly, with the purposes of the demand letter [sic], there is no right to obtain relief for any wrongful act that is not described in the letter. <u>Bressel v. Jolicoeur</u>, 34 Mass. App. Ct. 205, 211 (1993).

Furthermore, in <u>Fernandes v. Havkin</u>, 731 F.Supp.2d 103 (D. Mass. 2010), the court observed

with reference to Mass. Gen. Laws ch. 93A, § 9(3):

> This "statutory notice requirement is not merely a procedural nicety, but, rather 'a prerequisite to suit.'" <u>Rodi v. New Eng. Sch. of Law</u>, 389 F.3d 5, 19

(1st Cir. 2004); *see* <u>Entrialgo v. Twin City Dodge, Inc.</u>, 368 Mass. 812, 333 N.E.2d 202, 204 (1975) ("demand letter listing the specific deceptive practices claimed is a prerequisite to suit and as a special element must be alleged and proved").

731 F.Supp.2d at 119-120.  *See also* <u>Manning v. State Farm Ins. Co.</u>, 1997 Mass. App. Div. 184, 1997 WL 672056 at *2 (Mass. Div. 1997) ("An adequate demand letter is a jurisdictional prerequisite to any claim brought under ch. 93A by a consumer plaintiff . . . . A demand letter under ch. 93A must reasonably describe not only the alleged unfair or deceptive act or practice, but also the claimed injury."); <u>Smith v. Jenkins</u>, 777 F.Supp.2d 264, 267 (D. Mass. 2011)(same).

In <u>In re Hart</u>, 246 B.R. 709 (Bankr. D. Mass. 2000), this Court, citing <u>York v. Sullivan</u>, found that the debtor had not sent a ch. 93A demand letter 30 days before filing his original complaint in the bankruptcy court but did send a written demand within 30-days prior to filing his amended complaint.  The Court  stated the following:

> [The Debtor] sent the demand letter to the Defendants on the same day that he filed his complaint [October 9, 1998]. However, the Debtor's original complaint did not contain a count under Chapter 93A. The Debtor included a Chapter 93A count in his First Amended Complaint which he filed on November 20, 1998. In <u>York v. Sullivan</u>, 369 Mass. 157, 338 N.E.2d 341 (1975), the Supreme Judicial Court observed the following:
>
> > [T]he thirty-day requirement, as part of the requirement of a written demand for relief, is a prerequisite to suit, to be alleged and proved. But it is not jurisdictional in the sense that a party cannot waive it, and we do not think it is open to the judge to raise the point on his own motion after trial and long after the thirty days have expired. Demand before suit is often a fruitless ceremony. . . .
> >
> > [E]ven if the first suit could be treated as a suit under c. 93A,

56

> subject to dismissal because it was begun too soon, such a
> dismissal should not ordinarily bar a suit brought after thirty
> days had run. . . .
>
> 369 Mass. at 163–64. *See also* Tarpey v. Crescent Ridge Dairy, Inc., 47
> Mass.App.Ct. 380, 391, 713 N.E.2d 975 (1999).

Hart, 246 B.R. at 734 n. 23.  Like the debtor in Hart, the Plaintiff's original complaint did not

contain a count under ch. 93A.  Indeed, it did not contain any separate counts.  Unlike the

debtor in Hart, however,  the Plaintiff never sent the Defendants a  Chapter 93A written

demand after the filing of the original complaint. The Plaintiff's original complaint was filed

on September 13, 2010. His First Amended Complaint was filed over six months later.  At

no time between the filing of the original complaint and the filing of the First Amended

Complaint did the Plaintiff send written demands in compliance with ch. 93A to the

Defendants.  Accordingly, to the extent either Hart or York v. Sullivan carve out a very

limited "safe harbor" from the rigorous requirements of Mass. Gen. Laws ch. 93A, § 9(3),

the Plaintiff failed to avail himself of that relief  Accordingly, the Court shall recommend

entry of summary judgment in favor of the Defendants with respect to Count III.

     E. Count IV - RESPA

        1. The Positions of the Parties

The Plaintiff alleges that the Defendants violated the Real Estate Settlement

Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2610, 2614-2617, because the February 26, 2010

letter in which he and his spouse disputed the amount owed, constituted a "qualified

written request" within the meaning of 12 U.S.C. § 2065(e) and that BAC failed to respond

to the letter.

The Defendants maintain that they are entitled to summary judgment because the

Debtor's February 26, 2010 letter was not a "qualified written request" ("QWR") within the

meaning of 12 U.S.C. § 2605(e)(1)(A) of RESPA as it did not outline a specific problem or a

request for specific information regarding servicing the loan.  The Defendants add that, even

if this Court were to find that the letter dated February 26, 2010 is a QWR and that BAC or

BONY (to which a letter was never sent) did violate RESPA, the Plaintiff did not allege, and

cannot prove, that he has suffered actual damages (demonstrable damages that occur "as

a result of" the specific violation complained of) or statutory damages (requiring the

showing of a "pattern of practice of noncompliance" by the servicer). 12 U.S.C. §§

2605(f)(1)(A) – (B); Mantz v. Wells Fargo Bank, N.A., No. 09-12010-JLT, 2011 WL 196915 at

*5 (D. Mass. 2011)(dismissing RESPA claim for failure to plead actual damages); In re

Holland, No. 04-18099-JNF, 2008 WL 4809493, * 9 (Bankr. D. Mass. 2008) (granting summary

judgment against debtor, in part, for failure to establish actual or statutory damages arising

from lack of a response to QWR).

2. Applicable Law

In Mantz v. Wells Fargo Bank, N.A., No. 09-12010-JLT, 2011 WL 196915 (D. Mass. Jan.

19, 2011), the court considered the pleading requirements to state a claim under RESPA.  It

stated:

> Section 2605 requires mortgage loan servicers who receive a "qualified written
> request" ("QWR") for action or information from a borrower to respond and,
> if necessary, to act within statutorily mandated periods of time. [12 U.S.C.  §

58

2605(e)(1)-(2)] RESPA defines a QWR as

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that-
>
> > (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> >
> > (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower. [12 U.S.C. § 2605(e)(1)(B)]
>
> Some courts have held that a plaintiff who alleges a violation of this provision must assert to whom the request was made, when the request was made, how the defendant failed to respond to the request, whether the statutory period for responding has elapsed, and whether the defendant meets the statutory definition of a servicer. Other courts have held that "alleging a breach of RESPA duties alone does not state a claim under RESPA. Plaintiffs must, at a minimum, also allege that the breach resulted in actual damages." Because the First Circuit has not opined on pleading requirements under Section 2605, this court adopts the abovementioned requirements.

Mantz 2011 WL 196915 at *4 (footnotes omitted).  In Mantz, the court concluded that the

plaintiff had failed to plead sufficient facts to support his claim under Section 2605 of

RESPA.  According to the court, the plaintiff alleged that defendant, AHMSI, violated

Section 2605 by "'failing to acknowledge Qualified Written Requests within the required

time allowed and/or failing to specifically respond to the specific requests denoted in the

aforementioned Qualified Written Requests.'"  Id. at *5.  The court, however, determined

that the plaintiff did not plead his claim under Section 2605 with sufficient specificity and

did not indicate when he sent the QWRs.  It added that the plaintiff did not claim that the alleged failure to respond to the QWRs resulted in actual damages.  Id.  Accordingly, the court dismissed the plaintiff's complaint against the servicer of his loan.

The Debtor relies upon a recent Seventh Circuit decision, Catalan v. GMAC Mortg. Corp., 629 F.3d 676 (7th Cir. 2011), in which the court, in response to the defendants' arguments that the plaintiff's letter did not constitute QWRs because they did not identify an error in the plaintiff's account or provide reasons for the plaintiff's belief that the account was in error, stated:

> RESPA does not require any magic language before a servicer must construe a written communication from a borrower as a qualified written request and respond accordingly. The language of the provision is broad and clear. To be a qualified written request, a written correspondence must reasonably identify the borrower and account and must "include a statement of the reasons for the belief of the borrower, *to the extent applicable*, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B) (emphasis added). *Any reasonably stated written request for account information can be a qualified written request*. To the extent that a borrower is able to provide reasons for a belief that the account is in error, the borrower should provide them, but any request for information made with sufficient detail is enough under RESPA to be a qualified written request and thus to trigger the servicer's obligations to respond. *See* 12 U.S.C. § 2605(e)(1)(A), (e)(2), and (e)(3); *see also* Garcia v. Wachovia Mortgage Corp., 676 F.Supp.2d 895, 909 (C.D.Cal.2009) (when construed in light most favorable to borrower, letter was a qualified written request even though it did not contain a statement of reasons for borrower's belief of error; letter provided sufficient detail regarding "other information" being sought); Rawlings v. Dovenmuehle Mortgage, Inc., 64 F.Supp.2d 1156, 1162 (M.D. Ala. 1999) (plaintiffs' claims survived summary judgment where court found that descriptions of payments made to a prior servicer sufficiently stated plaintiffs' reasons for their belief that their account was in error and were qualified written requests).

Catalan, 629 F.3d at 687 (emphasis supplied).

     3. Analysis

The Court has noted the unexplained charges assessed with respect to the Debtor's

Property set forth in the Motion for Relief from the Automatic Stay ("accrued open charges"

of $28,829.74) filed in the Debtor's spouse's Chapter 13 case as a potential source of

confusion on the part of the Plaintiff, assuming those charges were legitimate. The Court

finds that the Debtor's February 26, 2010 letter qualifies as a QWR and that BAC was

required to respond to the Debtor's QWR within 60 days. Instead of providing the Plaintiff

with the information set forth in 12 U.S.C. § 2605(e)(2), BONY as Trustee and Orlans Moran

continued with the foreclosure proceedings commenced on November 27, 2009.

The Debtor, in his February 26th letter, disputed the amount of the outstanding debt,

adding: "[w]e have stated this to Wilshire in previous communications."  Additionally,

BAC, in its February 1, 2010 letter, stated that "If you notify BAC Home Loans in writing,

. . . that you dispute the debt or any portion of the debt, BAC Home Loans will obtain

verification of the debt and mail it to you." Based upon those considerations, the Court finds

that BAC failed to establish the absence of genuine issues of material fact that would entitle

it to summary judgment on Count IV.

Moreover, based upon the decision of the Seventh Circuit in Catalan, the split among

courts as to whether damages for a RESPA violation must be alleged, and the absence of

controlling authority in the First Circuit, the Court finds that the Debtor was not required

to expressly set forth the damages he suffered as a result of the RESPA violation and that

61

damages from a failure to respond to the QWR can be inferred. Accordingly, the Court shall recommend entry an order denying summary judgment as to BAC but granting summary judgment as to the remaining Defendants.

F. Count V -Fair Debt Collection Practices Act

1. The Positions of the Parties

The Debtor alleges that the Defendants violated the Fair Debt Collections Practices Act, 15 U.S.C. §§ 1692-1692o, and its Massachusetts counterpart, Mass. Gen. Laws ch. 93, § 49 because he was not in default at the time the Defendants commenced foreclosure proceedings, or, in the alternative, that the amount of any default was substantially less than what the Defendants claimed in written and verbal communications. Thus, by misrepresenting the amount and character of the debt, the Plaintiff maintains that the Defendants violated the FDCPA.

The Defendants maintain that they are entitled to summary judgment because they did not violate the FDCPA or its Massachusetts counterpart. They contend there is an absence of any evidence that they engaged in any conduct that was "unfair, deceptive or unreasonable . . ." or abusive, adding that, except for BAC, they are not debt collectors within the meaning of the statute and that BAC, even if it misrepresented the amount due, took no action to collect the debt. Rather, as evidenced by the power of attorney, BONY as Trustee employed Orlans Moran to conduct foreclosure proceedings. They also argue that the Debtor's allegations that BAC misstated "the amount or character of the debt" is insufficient to withstand their Motion for Summary Judgment.

62

## 2. Applicable Law[35]

---

[35] The Massachusetts counterpart to the FDCPA is set forth at Mass. Gen. Laws ch. 93, § 49.  It provides:

> No one who is a creditor or an attorney for a creditor, or an assignee of a creditor, of a natural person present or residing in Massachusetts who has incurred a debt primarily for personal, family or household purposes shall collect or attempt to collect such debt in an unfair, deceptive or unreasonable manner.
>
> For the purposes of this section, such collection or attempt to collect shall be deemed unfair, deceptive or unreasonable if:
>
> (a) The creditor communicates, threatens to communicate, or implies the fact of such debt or alleged debt to a person other than the person who might reasonably be expected to be liable therefor, or to an authorized user after the fact if that status is communicated to the creditor in writing, except with the written permission of the alleged debtor. The provisions of this paragraph shall not prohibit a creditor from notifying a debtor of the fact that the creditor may report a debt or alleged debt to a credit bureau or engage an agent or an attorney for the purpose of collecting the debt or alleged debt. For the purposes of this paragraph, the use of language on envelopes indicating that the communication relates to the collection of a debt shall be deemed a communication of such debt or alleged debt.
>
> (b) The creditor communicates directly with the alleged debtor after notification from an attorney representing such debtor that all further communications relative to the debt should be addressed to him.
>
> (c) The creditor communicates with the alleged debtor in such a manner as to harass or embarrass the alleged debtor, including, but not limited to communication at an unreasonable hour, with unreasonable frequency, by threats of violence, by use of offensive language, or by threats of any action which the creditor in the usual course of business does not in fact take.
>
> (d) The creditor communicates with alleged debtors through the use of forms or instruments that simulate the form and appearance of judicial process.

In <u>In re Hart</u>, 246 B.R. 709 (Bankr. D. Mass. 2000), this Court examined the elements

of a claim under the FDCPA.  It stated:

> Liability under the FDCPA, a statute designed to protect consumers from "abusive, deceptive, and unfair debt collection practices," 15 U.S.C. § 1692(a), is predicated upon improper conduct on the part of "debt collectors" in collecting "debts" owed or allegedly owed by "consumers." It is to be liberally construed to effectuate its purpose. *See generally* Daniel A. Edelman, An Overview of the Fair Debt Collection Practices Act, 113 PLI/Corp. 87 (1999).

> ***

> The FDCPA contains substantive prohibitions that apply to "communications" with consumers. A communication is defined to include "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). The FDCPA requires that debt collectors "disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11).

> The FDCPA specifically proscribes "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. It also proscribes the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The statute provides the following with respect to false or misleading representations:

>> Without limiting the general application of the foregoing, the following conduction is a violation of this section: . . .

>> (2) *The false representation of -*

---

Failure to comply with the provisions of this section shall constitute an unfair or deceptive act or practice under the provisions of chapter ninety-three A.

Mass. Gen. Laws ch. 93, § 49.

> (A) the character, *amount*, or legal
> status *of any debt*. . .

> (5) The threat to take any action that cannot
> legally be taken or that is not intended to be
> taken. . . .

15 U.S.C. § 1692e(2)(A) and (5). The FDCPA also makes it unlawful to "use unfair or unconscionable means to collect or attempt to collect any debt," including "[t]he collection of any amount (including any interest, fee, charge, or expenses incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

In evaluating whether communications or conduct violates the FDCPA, courts utilize the so-called "least sophisticated debtor" standard. Taylor v. Perrin, Landry, de Launay & Durand, 103 F.3d 1232, 1236 (5th Cir.1997); Clomon v. Jackson, 988 F.2d 1314, 1318–19 (2d Cir.1993); Smith v. Transworld Systems, Inc., 953 F.2d 1025, 1028–29 (6th Cir.1992); Graziano v. Harrison, 950 F.2d 107, 111 (3d Cir.1991); Swanson v. Southern Oregon Credit Service, Inc., 869 F.2d 1222, 1225–26 (9th Cir.1988); *see also* Gammon v. GC Services L.P., 27 F.3d 1254 (7th Cir.1994) ("unsophisticated consumer" standard). The Seventh Circuit has stated that "[a]nyway it's viewed, the standard is low," Avila v. Rubin, 84 F.3d 222, 226 (7th Cir.1996), and the phrase unsophisticated or least sophisticated debtor is used "to describe the hypothetical consumer whose reasonable perceptions will be used to determine if collection messages are deceptive or misleading." Gammon, 27 F.3d at 1257. The court observed that the standard protects consumers who are "of below average sophistication or intelligence" or are "uninformed, naive or trusting" while at the same time the reasonableness element "shields complying debt collectors from liability for unrealistic or peculiar interpretations of collection letters." Id.

Violation of any provision of the FDCPA entitles the consumer to an award of actual damages, statutory damages up to $1,000, costs and attorney's fees. 15 U.S.C. § 1692k(a). With respect to actual damages, which may include compensation for emotional distress, state law requirements that must be proven to establish negligent or intentional infliction of emotional distress are inapplicable. *See* Teng v. Metropolitan Retail Recovery Inc., 851 F.Supp. 61, 68–69 (E.D.N.Y.1994); Donahue v. NFS, Inc., 781 F.Supp. 188, 193–94 (W.D.N.Y.1991); Smith v. Law Offices of Mitchell N. Kay, 124 B.R. 182, 185 (D.Del.1991); Crossley v. Lieberman, 90 B.R. 682 (E.D.Pa.1988), *aff'd*, 868 F.2d

566 (3d Cir.1989).

Hart, 246 B.R. at 729-30 (emphasis supplied). *See also* Cavil v. Trendmaker Homes, Inc., No. G-10-304, 2010 WL 5464238 at *5 (S.D. Tex. Dec. 29, 2011) ("The FDCPA makes it unlawful for debt collectors to use abusive tactics while collecting debts for others.").

### 3. Analysis

The Court finds that BAC and Orlans Moran are debt collectors within the meaning of the FDCPA.   BAC and Orlans Moran admitted their status as such in written communications with the Debtor, as each Defendant represented that it was attempting to collect a debt (BAC in its February 1, 2010 letter, stating that the Debtor owed $116,348.59, and Orlans Moran in its March 18, 2010 letter to the Debtor), *see* Maxwell v. Fairbanks Capital Corp. (In re Maxwell), 281 B.R. 101, 119 (Bankr. D. Mass. 2002).  With respect to the status of the foreclosing mortgagees and their agents as debt collectors, however, case law is not consistent.  In Moore v. Morg. Elec. Reg'n Sys., Inc. , __ F.Supp.2d __, 2012 WL 253834 at *12, n.11 (D. N.H. Jan. 27, 2012), the court, while recognizing that there was support for the position that attorneys conducting foreclosure sales are not subject to the FDCPA, *see, e.g.*, Beadle v. Haughey, No. 04-272-SM, 2005 WL 300060 (D. N.H. Feb. 9, 2005)(concluding that attorneys who conducted foreclosure proceedings were not subject to FDCPA); Speleos v. BAC Home Loans Servicing, LP, 824 F.Supp.2d 226,  232-33 (D. Mass. 2011)(recognizing disagreement in the case law but concluding enforcement of a security interest was not debt collection activity), noted that other courts expressed concern for the creation of "an enormous loophole" in the law.  *See* Wilson v. Draper & Goldberg, P.L.L.C., 443 F.3d 373,

66

376 (4th Cir.2006)("We see no reason to make an exception to the Act when the debt

collector uses foreclosure instead of other methods."); Piper v. Portnoff Law Assocs., Ltd.,

396 F.3d 227, 236 (3d Cir.2005) ("We agree with the District Court that if a collector were

able to avoid liability under the [Act] simply by choosing to proceed in rem rather than in

personam, it would undermine the purpose of the [Act].")(internal quotation marks

omitted)); Pettway v. Harmon Law Offices, P.C., No. 03-CV-10932-RGS, 2005 WL 2365331

(D. Mass. Sept. 27, 2005).

Except for BAC, however, the Debtor, in response to the Defendants' Motion for

Summary Judgment, did not adduce evidence that would create a genuine issue of material

fact that any of the Defendants' conduct was objectively abusive or designed to harass him.

Although the Debtor's spouse stated "I am firmly convinced that the actions of Bank of

America were a calculated, intentional series of acts designed to deceive and mislead me

and my husband," her subjective belief cannot be imputed to the Plaintiff and falls far short

of what is required to establish a violation of 15 U.S.C. § 1692e(5).  Nevertheless, the

Defendants attached to the Affidavit of Alejandra Silva, a Vice -President at Bank of

America, "a true and accurate copy of the loan history."  Although that loan history is

evidence that the Debtor was in default, no matter which way the numbers in that

accounting are added up, they fall significantly short of $116,348.59,[36] the amount BAC

---

[36] The Transaction History, which is dated January 20, 2011, sets forth a principal
balance of $32,282.79 as of January 12, 2010; an "Escrow" of -$1,735.20, an "Esc Bal" of
-$61,257.37, for a total of $95,275.36, a sum $21,091.23 less than the amount claimed.
Although the Transaction History contained columns for fees and charges, none were
listed, except at the end of the document where two sums, $490.49 and $306.95, are

represented to the Debtor was due to "GMAC-RFC SSID Z86" on February 1, 2010. Thus,

the Court concludes that BAC is not entitled to summary judgment as there is a genuine

issue of material fact as to whether it made a false representation as to the amount of the

debt in its February 1, 2010 letter to the Debtor in violation of 15 U.S.C. 1692e(2)(A).

Accordingly, the Court shall recommend entry of summary judgment in favor of all

Defendants, except BAC, as to Count V.


G. Count VI - Deceit and Misrepresentation

1. The Positions of the Parties

The Debtor's claim for deceit and misrepresentation is predicated upon the same

alleged conduct underlying his claim for promissory estoppel, specifically that the

Defendants promised to postpone the foreclosure sale while considering his HAMP

eligibility and that they deceived him by misrepresenting their true intention to foreclose

as quickly as possible.[37] The Plaintiff, relying upon his Complaint, argued that

representatives of BAC promised to postpone the sale, and he relied on those promises by

refraining from retaining an attorney or filing a bankruptcy petition.

The Defendants maintain that they are entitled to summary judgment on Count VI,

arguing as follows:

---

listed. The addition of those items would not produce $116,348.59, which was the
alleged amount due as of November 18, 2009.

[37] The Plaintiff conceded as much because in prior memoranda filed with the
Court he discussed his claims under Count II and Count VI together.

There are no facts here indicating that any of the Defendants misled Plaintiff about the pending foreclosure. Plaintiff received notices of the pending foreclosure from Orlans Moran, which would indicated [sic] that the foreclosure would proceed. . . . All continuances of the foreclosure sale were done via oral proclamations on the date of the continued sale. . . . Nothing in the loan modification correspondence indicates that Plaintiff could ignore these notices. To the contrary, the HAMP application clearly states that Plaintiff was obligated to respond to foreclosure notices until he was approved for a Trial Period Plan or other modification. Because Plaintiff received written correspondence and associated HAMP materials stating that he had a continuing obligation to respond to foreclosure notices, it is impossible to establish that Defendants ever misrepresented their intentions. Therefore, Summary Judgment should be granted to Defendants on Count VI of the First Amended Complaint.

Specifically, the Defendants argue that the Plaintiff cannot show reliance, stating that Defendants never made a representation to induce Plaintiff to act or refrain from acting. In response to the Defendants' Motion, the Plaintiff did not specifically point to evidence in the record other than the allegations in his Complaint that BAC consistently promised that the auction would be postponed.

2. Analysis

Because Count VI is denominated Deceit <u>and</u> Misrepresentation, because the Plaintiff failed to set forth the elements of a claim for negligent misrepresentation, *see* <u>Cummings v. HPG Int'l, Inc.</u>, 244 F.3d 16, 23 (1st Cir. 2001) (to establish a claim for negligent misrepresentation under Massachusetts law, a plaintiff must prove that the defendant provided it with false information and "with failure to exercise reasonable care or competence in obtaining or communicating the information"), and because of the cursory reference to <u>Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.</u>, 445 Mass. 441

(2005), the Court concludes that the Plaintiff intended to state a cause of action for

intentional misrepresentation.

In <u>Cummings</u>, the United States Court of Appeals for the First Circuit observed:

The borderline between what is an action for deceit and what is an action for negligent misrepresentation is unclear under Massachusetts case law. In an action for deceit under Massachusetts law, a plaintiff must show that the defendant: made a false representation of material fact; for the purpose of inducing reliance; and that plaintiff relied upon the representation to his or her detriment. <u>Danca v. Taunton Sav. Bank</u>, 385 Mass. 1, 429 N.E.2d 1129, 1133 (1982); <u>Snyder v. Sperry and Hutchinson Co.</u>, 368 Mass. 433, 333 N.E.2d 421, 428 (1975). Proof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge. <u>Snyder</u>, 333 N.E.2d at 428. The uncertainty has to do with what role the speaker's knowledge of the falsity plays.

Many Massachusetts cases say that an element of deceit is that the speaker "made a false representation of a material fact with knowledge of its falsity." <u>Danca</u>, 429 N.E.2d at 1133 (emphasis added); *see also* <u>Slaney v. Westwood Auto, Inc.</u>, 366 Mass. 688, 322 N.E.2d 768, 779 (1975) (comparing common law fraud to Chapter 93A claim); <u>Barrett Assoc. v. Aronson</u>, 346 Mass. 150, 190 N.E.2d 867, 868 (1963); <u>Kilroy v. Barron</u>, 326 Mass. 464, 95 N.E.2d 190, 191 (1950); <u>Rood v. Newberg</u>, 48 Mass.App.Ct. 185, 718 N.E.2d 886, 892 (1999); *accord* <u>Borden v. Paul Revere Life Ins. Co.</u>, 935 F.2d 370, 379 (1st Cir.1991). But other deceit cases say "plaintiffs need not prove that [defendant] knew his statement to be false" so long as there is proof that the representation was false and susceptible of actual knowledge. <u>Nickerson v. Matco Tools Corp.</u>, 813 F.2d 529, 530 (1st Cir.1987); *see also* <u>VMark Software, Inc. v. EMC Corp.</u>, 37 Mass.App.Ct. 610, 642 N.E.2d 587, 593 n. 9 (1994) (speaker need not know statement is false if fact represented is susceptible of actual knowledge); <u>Zimmerman</u>, 31 Mass.App.Ct. 72, 575 N.E.2d 70 at 74 (same); <u>Acushnet Fed. Credit Union v. Roderick</u>, 26 Mass.App.Ct. 604, 530 N.E.2d 1243, 1244-45 (1988) (same).

At the very least, there is a lack of clarity in Massachusetts case law. . . . The Supreme Judicial Court has not, as best we can tell, addressed this question. But it has referred to the Restatement (Second) of Torts in this area, *see* <u>Robertson v. Gaston Snow & Ely Bartlett</u>, 404 Mass. 515, 536 N.E.2d 344, 349 (intentional misrepresentation), *cert denied*, 493 U.S. 894, 110 S.Ct. 242, 107

L.Ed.2d 192 (1989); Rasmussen, 243 N.E.2d at 168-69 (same); <u>Danca</u>, 429 N.E.2d at 1134 (negligent misrepresentation), so we will use those Restatement definitions.

Since Massachusetts considers deceit to be a variety of fraud, we utilize the definition in Restatement (Second) of Torts § 526:

> A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

"Knowledge" for the purpose of showing fraud is established by any of these three conditions. A claim of deceit has been categorized as an intentional tort, <u>Mohr v. Com.</u>, 421 Mass. 147, 653 N.E.2d 1104, 1115 n. 16 (1995); <u>G & B Assoc. v. Springfield</u>, 39 Mass.App.Ct. 51, 653 N.E.2d 203, 205 (1995). As will be discussed later, "[m]ere negligence in discovering the falsity before making the representation is not sufficient for an action in tort for deceit, but it is enough for an action in negligence." 37 J. Nolan & L. Sartorio, Massachusetts Practice § 143 at 240-41 (2d ed.1989). A defendant who makes a false statement may be liable for deceit if he implicitly conveyed that he had knowledge of the represented fact. *See* <u>McEneaney</u>, 650 N.E.2d at 96; Restatement (Second) of Torts § 526.

<u>Cummings v. HPG Int'l, Inc.</u>, 244 F.3d at 22-23. *See also* <u>Aliberti v. GMAC Mortg., LLC</u>, 779 F.Supp.2d 242, 248 (D. Mass. 28, 2011) ("To prevail on a claim for misrepresentation under Massachusetts law, a plaintiff must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon and that plaintiff reasonably relied upon the representation to his or her detriment.").

The Court finds that the burden to establish the existence of genuine issues of material act shifted to the Plaintiff and he failed to meet that burden. The Plaintiff neither

pled nor pointed to any evidence in the record to create a genuine issue of material fact as to misrepresentations with knowledge of falsity or intent to deceive by BAC or any of the other Defendants other than conclusory assertions.

In Vincent v. Ameriquest Mortg. Co. (In re Vincent), 381 B.R. 564 (Bankr. D. Mass. 2008), the bankruptcy court determined that the plaintiff's allegations were sufficient to state a claim for fraud and withstand a motion to dismiss. In that case, the plaintiff alleged that she contacted the defendant in or around August of 2005 about refinancing her mortgage; that she had a telephone interview with someone from Ameriquest during which she informed the interviewer that she was unemployed and needed to refinance her mortgage loan to reduce her monthly payment; that the interviewer told her to stop making her existing mortgage payments; that Ameriquest prepared a false loan application; that in October of 2005, the plaintiff refinanced her property at an unfavorable rate and at a high cost; and that, shortly thereafter, she was unable to make the monthly payments. The court, in finding those facts sufficient to state a cause of action for fraud, as opposed to withstanding a motion for summary judgment, stated:

> Ameriquest's assertion that fraud has not been pled with the particularity required by Fed.R.Civ.P. 9(b), made applicable by Fed. R. Bankr.P. 7009, is misplaced. "Generally, there are three purposes behind Rule 9(b)'s particularity requirement: (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit;' and (3) to safeguard defendants from frivolous charges which might damage their reputations." New England Data Services, Inc. v. Becher, 829 F.2d 286, 288 (1st Cir.1987). The Plaintiff need not recite the "exact" words nor must she identify the exact date of her telephone conversation and identity of the Defendant's employee when those facts are already known to Ameriquest. The loan

application contains a file number and the telephone interviewer's name, certainly enough information for Ameriquest to identify who spoke on its behalf to the Plaintiff.

Vincent, 381B.R. at 574.

In contrast to the specific facts alleged by the plaintiff in <u>Vincent</u>, the Plaintiff's Complaint is devoid of information required to support a claim for intentional misrepresentation or fraud, let alone withstand a motion for summary judgment. *See* <u>Anilus v. OneWest Bank, FSB</u>, 26 Mass. L. Rpr. 406, 2011 WL 2735052 at *3 *(*Mass. Super. Ct. 2011)*(*"At a minimum, the plaintiff needs to identify the person making the representation, the contents of the representation, and where and when such representation took place . . . ."). The Plaintiff failed to adduce evidence concerning when he or his spouse called a Defendant, when he received notices of continued foreclosure sales, what was specifically represented to him when he received those notices, if any, when he learned of the September 3, 2010 foreclosure sale, and the basis for his belief that one or all the Defendants intended "to foreclose as quickly as possible" when almost five months passed after the originally scheduled foreclosure sale of April 9, 2010 before the foreclosure sale took place. In view of those omissions, the Court finds that the August 4, 2010 letter, standing alone, is insufficient to withstand the Defendants' Motion for Summary Judgment with respect to Count VI, particularly as BAC did not specifically represent that the September 3, 2010 foreclosure sale would be postponed. While this Court has determined that summary judgment against BAC is not warranted under Count II based upon a promissory estoppel theory, such an action sounds in contract. Fraud and deceit, however, sound in tort and

73

require more.  Although the August 4, 2010 letter may have "dangled the Debtor on a string," the record establishes that he had been advised in the FAQs six months earlier that he was obliged to respond to foreclosure notices, until he was approved for a Trial Period Plan or other loan modification.  Accordingly, the Court shall recommend entry of summary judgment in favor of the Defendants on Count VI.

　　　H. Count VII - Negligence

　　　　　1. The Positions of the Parties

The Debtor's negligence claim is predicated upon an alleged breach of a fiduciary duty to act fairly and in good faith in foreclosing the mortgage.  The Debtor relies on the facts alleged in the Complaint, which resulted in the loss of the equity of redemption.

The Defendants argue that to the extent that Plaintiff implies that BAC violated HAMP while considering his loan modification, any such violation would not create a duty to Plaintiff or provide him with any other basis for a negligence claim.  They maintain that there is no common law duty owed to a borrower by a servicer/lender (or their foreclosure counsel), citing Brown v. Bank of Am. Corp., No. 10-11085, 2011 WL 1311278 (D. Mass. March 31, 2011 ("the existence of a positive regulation imposing a duty on one actor does not by itself create a similar duty as a matter of state tort common law."); Sorenson v. H&R Block, Inc., No. 99-10268-DPW, 2002 WL 31194868, at *10 (D. Mass. Aug. 27, 2002), aff'd, 107 Fed. App'x 227 (1st Cir. 2004) ("I find it to be the long settled rule that violation of a statute -- whether federal or state, and whether permitting a private right of action or not – 'does not by itself establish a breach of a duty, for it does not constitute negligence per se.'");

74

Pimental v. Wachovia Mortg. Corp., 411 F.Supp. 2d 32, 39-40 (D. Mass. 2006)(dismissing borrower's negligence claim against lender where lender owed no duty of care to the borrower); In re Fordham, 130 B.R. 632, 646 (Bankr. D. Mass. 1991)(no duty of reasonable care owed to borrower by lender); Glidden v. Maglio, 430 Mass. 694, 696 (2000)(affirming that duty is an essential element of a negligence claim under Massachusetts law); Bennett v. Eagle Brook Country Store, Inc., 557 N.E.2d 1166, 1168 (Mass. 1990). They also maintain that the Debtor's negligence claim against the Defendants is barred entirely by the economic loss doctrine, which precludes recovery unless the Debtor can establish that the injuries he suffered due to the Defendants' negligence involved physical harm or property damages, not solely economic loss," citing Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 469 (2009); Garweth Corp. v. Boston Edison Co., 415 Mass. 303, 305 (1993) (holding that "[t]he traditional economic loss rule provides that, when a defendant interferes with a contract or economic opportunity due to negligence and causes no harm to either the person or property of the plaintiff, the plaintiff may not recover for pure economic losses," and affirming grant of summary judgment on the basis of the economic loss doctrine rule).

In response to the Defendants' arguments, the Debtor argues that In re Fordham, 130 B.R. 632 (Bankr. D. Mass. 1991), pertains to the liability of a lender to a borrower with a commercial loan and that it is well settled that a foreclosing mortgagee has a fiduciary duty to the borrower and all other claiming in his right, citing Sandler v. Silk, 292 Mass. 493 (1935). He adds that the economic loss doctrine is inapplicable, citing Passatempo v.

75

McMenimen, 461 Mass. 279 (2012).

2. Applicable Law

In Speleos v. BAC Home Loans Servicing, L.P., 755 F.Supp. 2d 304 (D. Mass. 2010), the court stated:

> To state a claim for negligence, the plaintiff must allege that the defendant 1) owed a legal duty to the plaintiff, 2) breached that duty and 3) was the proximate or legal cause of 4) actual damage or injury.

Id. at 310 (citing Jorgensen v. Mass. Port Auth., 905 F.2d 515, 522 (1st Cir.1990)).  In Speleos, the plaintiffs, like the Plaintiff in this adversary proceeding, argued that the defendants' violation of the HAMP Guidelines constituted evidence of negligence because, under those Guidelines, the defendants had a duty not to foreclose until the plaintiffs had been evaluated for a modification.  The court agreed citing HAMP Guidelines which provided the following:

> "To ensure that a borrower currently at risk of foreclosure has the opportunity to apply for HAMP, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program and, if eligible, an offer to participate in HAMP has been made."

755 F.Supp.2d at 311 (citing U.S. Dep't of the Treasury, Home Affordable Modification Program Guidelines, § VII, 610.04.04).

According to the court in Speleos, the plaintiffs alleged that they were in the process of applying for a loan modification when the defendants foreclosed and that they were eligible for consideration for a loan modification.  The defendants maintained that, because there is no private cause of action under HAMP, the plaintiffs' claim could not be brought

as a common law negligence claim, particularly as federal courts have held that there is no

private right of action under HAMP.   755 F.Supp.2d at 311 (citing, inter alia, <u>Hart v.

Countrywide Home Loans, Inc.</u>, 735 F.Supp.2d 741, 746–48 (E.D. Mich. 2010)).   The court

held:

> [I]n Massachusetts, violations of a statute or regulation may constitute
> evidence of negligence. <u>Berish v. Bornstein</u>, 437 Mass. 252, 770 N.E.2d 961, 979
> (2002). A claim for negligence based on a statutory or regulatory violation can
> survive even where there is no private cause of action under that statute or
> regulation. *See, e.g.*, <u>Practico v. Portland Terminal Co.</u>, 783 F.2d 255, 265 (1st
> Cir.1985) (finding that plaintiffs could bring a negligence per se claim based
> on a violation of Occupational Safety and Health Act even though the statute
> did not provide a private cause of action); <u>Sorenson v. H & R Block, Inc.</u>, No.
> 99–cv–10268–DPW, 2002 WL 31194868, at *10, 2002 U.S. Dist. LEXIS 18689, at
> *29 (D.Mass. Aug. 27, 2002).
>
> Here, evidence of a violation of the HAMP Guidelines may constitute
> evidence of breach of a duty because the harm that the Plaintiffs allegedly
> incurred is of the kind that the Guidelines were designed to prevent and the
> Plaintiffs are within the class of persons that the Guidelines are intended to
> benefit. *See* <u>Sorenson</u>, 2002 WL 31194868, at *10, 2002 U.S. Dist. LEXIS 18689,
> at *30. Thus, the Plaintiffs have stated a plausible negligence claim.

<u>Speleos</u>, 755 F.Supp.2d at 311. *But see* <u>Provost v. Saxon Mortg. Servs.. Inc.</u>, No. 4:11-cv-40137-

TSH, 2012 WL 1065481 (D. Mass. Mar. 27, 2012); <u>Markle v. HSBC Mortg. Corp. (USA)</u>, No.

10–40189, __ F.Supp.2d __, 2011 WL 6944911 (D.Mass. July 12, 2011). *Cf.* <u>Maldonado v. AMS

Servicing LLC</u>, No. 11-40044-FDS, 2012 WL 220249 at *6 (Bankr. D. Mass. Jan. 24, 2012) ("A

HAMP violation itself does not provide a private cause of action to the borrower, although

it may provide the basis of a violation of Chapter 93A.").

As noted above, like the defendants in <u>Speleos</u>, the  Defendants maintain that they

owed no duty of care to the Debtor. They cite <u>In re Fordham</u>, 130 B.R. 632, 646 (Bankr. D.

Mass. 1991), and <u>Pimental v. Wachovia Mortg. Corp.</u>, 411 F.Supp.2d 32, 39–40 (D. Mass.

2006)(basing negligence claim on alleged fiduciary duty of mortgagee).  The court in <u>Speleos</u>

observed, however, that the <u>Fordham</u> and <u>Pimental</u> cases were brought under different

theories of negligence and are inapposite.  <u>Spelios</u>, 755 F.Supp.2d at 311.

In <u>Brown v. Bank of Am. Corp.</u>, No. 10-11085 2011 WL 1311278 (D. Mass. Mar. 31,

2011), the court reached a different result.  It stated:

> The plaintiff's argument depends on the proposition that, under
> Massachusetts common law and apart from any obligation imposed by
> positive regulation, a foreclosing mortgagee owes the mortgagor a duty of
> due care in the execution of the foreclosure, such that a breach of that duty
> gives rise to a claim for damages proximately caused. Not surprisingly, the
> plaintiff points to no Massachusetts legal authority for that proposition.
> Generally, a duty of care arises from the relationship of parties to one another:
> landlord and tenant, doctor and patient, driver and passenger, etc. Opposing
> litigants have not been included among the kinds of relationships that give
> rise to a duty of care each owes to the other. And the existence of a positive
> regulation imposing a duty on one actor does not by itself create a similar
> duty as a matter of state tort common law. <i>See</i> <u>Sorenson v. H & R Block, Inc.</u>,
> No. 99–10268–DPW, 2002 WL 31194868, at * 10 (D.Mass. Aug.27, 2002)
> (finding it to be "the long settled rule that violation of a statute—whether
> federal or state, and whether permitting a private right of action or not—'does
> not by itself establish a breach of duty, for it does not constitute negligence
> per se'") (quoting <u>Bennett v. Eagle Brook Country Store, Inc.</u>, 408 Mass. 355,
> 557 N.E.2d 1166, 1168 (Mass.1990)). <i>So while violation of a regulation such as
> HAMP may provide evidence of a breach of a duty otherwise owed, it does not create
> such a duty in the first place.</i> To the extent that the <u>Speleos</u> case cited above is
> to the contrary, I respectfully disagree with its reasoning and decline to follow
> it.

<u>Brown</u>, 2011 WL 1311278 at *4 (emphasis supplied).  <i>See also</i> <u>Markle v. HSBC Mortg. Corp.</u>

<u>(USA)</u>, 2011 WL 6944911 at *8; <u>Provost v. Saxon Mortg. Servs., Inc.</u>, 2012 WL 1065481, *2;

<u>Nash v. GMAC Mortg., LLC</u>, No. 10-493 S, 2011 WL 2470645 (D. R.I. May 18, 2011), <i>report</i>

*and recommendation adopted by* 2011 WL 2469849 (D. R.I. June 20, 2011); Clark v. Countrywide

Home Loans, Inc., 732 F.Supp.2d 1038, 1044 (E.D. Cal. 2010)("Financial institutions owe no

duty of care to a borrower when the institution's involvement in the loan does not exceed

the scope of its conventional role as a mere lender of money.").

In Blackwood v. Wells Fargo Bank, N.A., No. 10-10483-JGD, 2011 WL 1561024 (D.

Mass. April 22, 2011), the court observed:

> "It is familiar law that a mortgagee in exercising a power of sale in a mortgage must act in good faith and must use reasonable diligence to protect the interests of the mortgagor." W. Roxbury Co-op. Bank v. Bowser, 324 Mass. 489, 492, 87 N.E.2d 113, 115 (1949). *Accord* Seppala & Aho Const. Co., Inc. v. Petersen, 373 Mass. 316, 320, 367 N.E.2d 613, 616 (1977), and cases cited; Pehoviak v. Deutsche Bank Nat'l Trust Co., No. 10–P–461, 79 Mass. App. Ct. 1101, 942 N.E.2d 208, 2011 WL 722613, at * 1 (Mass. App. Ct. March 3, 2011) (table). At least one judge in this jurisdiction has found that where the mortgagee has scheduled a foreclosure sale while the plaintiff's request for a loan modification was pending, in violation of HAMP guidelines, there was a substantial likelihood that the plaintiff would prevail on his claim that the mortgagee had violated its duty to act in good faith. *See* Cruz v. Hacienda Assoc., LLC, Bankr.No. 10–43793–MSH, 2011 WL 285229, at *3 (Bankr. D. Mass. Jan. 26, 2011). Another judge of the Massachusetts Bankruptcy Court recently ruled that "[i]n view of the novelty of this theory, the lack of Massachusetts case law on point, and the lack of argument on it from [the mortgagee]," he would deny a motion to dismiss, and leave for summary judgment the issue whether a Bank's refusal to offer a loan modification before foreclosing, as required under its SPA, constituted a violation of its duty of good faith and reasonable diligence. *See* Fernandes v. U.S. Bank, N.A., Bankr. No. 10–17925–FJB, 2011 WL 322017, at *1 (Bankr. D. Mass. Jan. 31, 2011). A similar result is warranted here. As detailed above, Blackwood has stated a claim for unfair and deceptive acts and practices in conducting the foreclosure sale when it did. If, as Blackwood has alleged, the defendants foreclosed when they lacked the legal authority to do so, they acted in violation of their obligation to protect the mortgagor. *See* Seppalo v. Aho Constr. Co., 373 Mass. at 321, 367 N.E.2d at 616 (obligation of foreclosing mortgagee to act in good faith and with reasonable diligence is designed to protect mortgagor and those holding junior encumbrances).

<u>Blackwood</u>, 2011 WL 1561024 at *5.  Notably, in <u>Cruz</u>, Judge Hoffman, in the context of a

claim for breach of the duty to act in good faith and with reasonable diligence by attempting

to foreclose the plaintiff's mortgage, stated:

> Massachusetts courts have consistently held that in addition to complying
> with the statutory requirements governing mortgage foreclosure set forth in
> Mass. Gen. Laws ch. 244, a mortgagee must act in good faith and must use
> reasonable diligence to protect the interests of the mortgagor. <u>Williams v.
> Resolution GGF OY</u>, 417 Mass. 377, 382–83, 630 N.E.2d 581 (1994). In <u>Snowden
> v. Chase Manhattan Mortgage Corp.</u>, 2003 WL 22519518 (Mass. Super.), the
> court held that a lender breached this duty by foreclosing a mortgage the day
> after receiving notice that the borrower had negotiated an agreement to sell
> the property at a price beneficial to the lender. The court noted that
> mortgagees in Massachusetts must act as a "trustee for the benefit of all
> persons interested." <u>Id.</u> at *2 ( quoting <u>Taylor v. Weingartner</u>, 223 Mass. 243,
> 247, 111 N.E. 909 (1916)).

<u>Cruz v. Hacienda Assoc., LLC</u>, Bankr.No. 10–43793–MSH, 2011 WL 285229, at *3 (Bankr. D.

Mass. Jan. 26, 2011). In <u>Snowden</u>, the case relied upon by Judge Hoffman in <u>Cruz</u>, the

plaintiffs commenced a ch. 93A action against a foreclosing mortgagee, alleging that it

engaged in unfair and deceptive acts and practices when it refused to postpone a

foreclosure sale when the plaintiffs had a ready, able and willing buyer.  The court stated:

> Even though there is no dispute that plaintiffs failed to make several
> mortgage payments, and, therefore, that Chase had a legal right to exercise its
> power of sale, the law requires that it must "exercise the utmost good faith,"
> <u>Taylor</u>, 233 Mass. at 247, and use reasonable diligence to protect the interests
> of the defaulting home owner. <u>Williams</u>, *supra*, 417 Mass. at 383. *See* <u>Levin v.
> Reliance Co-Operative Bank</u>, 301 Mass. 101, 103 (1938)(A mortgagor has a
> basis for a tort action against the mortgagee despite the existence of a default
> whenever a foreclosure is conducted negligently or in bad faith); <u>Fenton v.
> Torrey</u>, 133 Mass. 138, 139 (1882)(One who undertakes to exercise the power
> of sale in a mortgage must act in good faith and with a careful regard for the
> interest of the principal). In circumstances such as these, the mortgagee
> "cannot shelter himself under a bare literal compliance with the conditions

imposed by the terms of the power [of sale]." Montague v. Dawes, 14 Allen 369, 373 (1890).

Snowden v. Chase Manhattan Mortgage Corp., 17 Mass. L. Rptr. 27, 2003 WL 22519518 at

*4 (Nov. 5, Mass. Super. 2003). See also Teixeira v. Fed. Nat'l Mortg. Ass'n, No. 10-11649-

GAO, 2011 WL 3101811 at * (D. Mass. July 18, 2011) ("A mortgagee must exercise good faith

in executing a foreclosure, particularly when it becomes the buyer of the home at the

foreclosure sale. See U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 941 N.E.2d 40, 50 n.16

(2011). The duty does not arise from a mortgage servicer's obligations under HAMP or other

statute, but rather, is an independent duty at common law to protect the interests of the

mortgagor in exercising a power of sale in a mortgage.").

Based upon the authorities referenced above, the Court finds that the purported

foreclosure of the mortgage by BONY as Trustee, without a valid assignment of the

mortgage from either FNMA or BONY, the conduct of Orlans Moran in proceeding with the

foreclosure sale without such an assignment in September of 2010, after the Supreme

Judicial Court's decision in Ibanez, and the August 4, 2010 letter from BAC to the Debtor

promising alternate responses to the Debtor's loan modification request, within 30 days,

responses which did not include proceeding with a foreclosure sale, provide some evidence

of negligence consistent with the decision in Speleos, notwithstanding the general rule that

the relationship between lender and borrower, without more, does not establish a fiduciary

relationship. See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 102 (1st Cir. 2009) (citing

Pimental v. Wachovia Mortg. Corp., 411 F.Supp.2d 32, 39 (D. Mass.2006) ("[l]enders

81

normally do not owe borrowers fiduciary duties"), and <u>Adams Co-Operative Bank v. Greenberg (In re Greenberg)</u>, 212 B.R. 422, 428 (Bankr. D. Mass. 1997), *aff'd*, 229 B.R. 544 (B.A.P. 1st Cir. 1999)). *See also* <u>Corcoran v. Saxon Mortg. Servs., Inc.</u>, No. 09-11468-NMG, 2010 WL 2106179, *4 (D. Mass. May 24, 2010) ("under Massachusetts law, neither a mortgage holder nor its servicer owes a fiduciary duty to a borrower").  Although Orlans Moran and BAC might not be entitled to summary judgment based on a duty arising from a breach of HAMP Guidelines, the economic loss doctrine poses an insurmountable challenge to the Debtor.

In <u>Fernandes v. Havkin</u>, 731 F.Supp.2d 103, 122 n.13 (D. Mass. 2010), the court explained the doctrine as follows:

> "In the context of ordinary negligence claims in tort actions, the Supreme Judicial Court has held that 'purely economic losses are unrecoverable . . . in the absence of personal injury or property damage.'" <u>Cummings v. HPG Int'l, Inc.</u>, 244 F.3d 16, 24 (1st Cir.2001). There has been discussion in Massachusetts courts regarding whether the doctrine applies to negligent misrepresentation. If applied to a negligent misrepresentation claim with only an economic injury, "even if a duty existed, the claim is barred by the economic loss doctrine which provides that, in negligence actions, 'purely economic losses are unrecoverable . . . in the absence of personal or property damage.'" <u>Corcoran v. Saxon Mortgage Servs., Inc.</u>, 2010 WL 2106179, *4 (quoting <u>FMR Corp. v. Boston Edison Co.</u>, 415 Mass. 393, 613 N.E.2d 902, 903 (1993)); *compare with* <u>Danca v. Taunton Sav. Bank</u>, 385 Mass. 1, 429 N.E.2d 1129, 1134 (1982) (the economic loss doctrine does not apply to negligent misrepresentation). By applying the economic loss doctrine, the <u>Corcoran</u> court rejected a negligent misrepresentation claim because the "alleged damages, the additional costs and interest accrued on the loan, are purely economic in nature." <u>Corcoran v. Saxon Mortgage Servs., Inc.</u>, 2010 WL 2106179 at *4. . . .

<u>Havkin</u>, 731 F.Supp.2d at 122 n. 13.  The Court finds that the economic loss doctrine applies to Count VII.  The Debtor maintains that the Defendants' alleged negligence caused him "to

suffer damages in the form, among other things, of his loss of his equity of redemption."

In view of the Court's conclusion that the foreclosure sale is void, the equity of redemption

has not been lost.  In the event the Court's finding with respect to the foreclosure sale were

to be successfully challenged, the Debtor's equity of redemption can be quantified in dollars.

In any event, the Debtor's damages, if any, do not involve personal injury or property

damage.  Moreover, the decision relied upon by the Debtor, Passatempo v. McMenimen, 461

Mass. 279 (2012), is distinguishable.  In that case,  the Supreme Judicial Court stated:  "The

economic loss doctrine derives from negligence and strict liability actions.  Even were we

to assume that the doctrine could apply to damages assessed for intentional conduct, it

nonetheless does not apply to "pecuniary loss incurred as a result of an actionable

misrepresentation." Id. (citing, inter alia, FMR Corp. v. Boston Edison Co., 415 Mass. 393,

395, 613 N.E.2d 902 (1993), and Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass. App. Ct.

15, 20–21 n. 1, 694 N.E.2d 401 (1998)).  In the instant case, the Court recommends allowance

of the Motion for Summary Judgment as to all the Defendants on Count VII as the Debtor

has no claims that could be excluded from the economic loss doctrine.

I. Count VIII -Accounting

In  his Complaint, the Debtor seeks an accounting with respect to the payment of his

mortgage loan.  Although this Court, on January 10, 2011, ruled that the Debtor was entitled

to a comprehensible accounting, the Defendants argue "[t]here is no such cause of action as

an "accounting" in the First Circuit," criticize the Debtor's "amorphous request," and

maintain that they have made various attempts at responding to that request.  The

Defendants cite Hersey v. WPB Partners, LLC, No. 10-cv-486-LM, 2011 U.S. Dist. Lexis

18485, slip op. at 6-7 (D. N.H. Feb. 8, 2011), in support of their position. In Hersey, the court

stated:

> Necessarily, WPB has identified no First Circuit authority for the proposition
> that the accounting Hersey seeks is even susceptible of valuation, much less
> valued at more than the jurisdictional limit. One thing, however, is certain: no
> decision the court could make on that request would have any direct
> "pecuniary consequences to those involved in the litigation." Leventhal, 389
> F.3d at 3. At best, the pecuniary consequences of the accounting are indirect
> and ill-defined, given that the accounting is unconnected to any pending legal
> claim, and that Hersey's request for that accounting has no legal basis. This
> court's equity powers are not so broad as to authorize a free-floating request
> for information that is essentially a request for discovery on a non-existent
> legal claim. In sum, WPB has not carried its burden of demonstrating that this
> court has subject-matter jurisdiction over Hersey's "equity request" for an
> accounting.

Id. (footnote omitted).

The Debtor rejects the Defendants' position that there is no cause of action for an

accounting, citing Beaton v. Land Court, 367 Mass. 385 (1975), in which the Court stated:

> If the obligation underlying the mortgage has been paid or otherwise
> discharged, the mortgagor may maintain a suit to compel the cancellation of
> the note and a discharge of the mortgage in a form appropriate for recording.
> Perry v. Oliver, 317 Mass. 538, 541, 59 N.E.2d 192 (1945). If a mortgagee begins
> the process of foreclosure, a suit in the Superior Court will lie to enjoin the foreclosure
> and to obtain an accounting. In such a suit, the issue whether the mortgage
> conditions have been violated may be litigated. McCombs v. Elmes, 197 Mass.
> 19, 21-22, 83 N.E. 306 (1907). See Newman v. Greenberg, 361 Mass. [594] . . . ,
> 281 N.E.2d 590 (1972).

Beaton, 367 Mass. at 393 (emphasis supplied).

Based upon the decision cited by the Debtor, the Court recommends  entry of

summary judgment is warranted as to all Defendants, except BONY and BAC Count VIII,

84

particularly where this Court previously ruled that the Debtor is entitled to a comprehensive and comprehensible accounting.

J. Count IX - Infliction of Emotional Distress

1. The Positions of the Parties

In support of Count IX, the Plaintiff alleged that the ordeal in dealing with the Defendants, including Orlans Moran, and the foreclosure auction itself, caused him to suffer emotional distress in the nature of loss of sleep, anxiety and fear of losing his home; that his spouse had to take him to the emergency room for treatment of "a possible heart attack brought on by these matters," that he suffered distress that was "outrageous and should not be tolerated in a civilized society," and that he was "damaged thereby." The Plaintiff highlights the duty a foreclosing mortgagee owes the mortgagor. Although he recognizes that a foreclosure sale does not necessarily result in actionable emotional distress, *see* Alpino v. JP Morgan Chase Bank, Nat'l Ass'n., No. 10-12040-PBS, 2011 WL 1564114 (D. Mass. April 21, 2011), he states that Count IX can survive because the foreclosure sale was wrongful, citing Morse v. Mutual Fed. Sav. & Loan Ass'n of Whitman, 536 F.Supp. 1271 (D. Mass. 1982).

The Defendants argue that they are entitled to summary judgment on Court IX because conducting a foreclosure sale when the mortgage was in default is neither extreme nor outrageous entitling the Debtor to damages. They emphasize a lack of duty with respect to negligent infliction of emotional distress and the lack of outrageous conduct on their part with respect to intentional infliction of emotional distress.

85

2. Applicable Law

Although the Debtor failed to plead the required elements to state a claim for either intentional or negligent infliction of emotional distress in his Complaint, in his Memorandum in Support of his Objection to the Motion for Summary Judgment, he referenced the elements of a claim for intentional infliction of emotional distress. In Laudani v. Tribeca Lending Corp. (In re Laudani), 401 B.R. 9 (Bankr. D. Mass. 2009), this Court set forth the elements of a cause of action for intentional infliction of emotional distress, stating:

> "To recover for intentional infliction of emotional distress as an independent claim, the plaintiff must show the following: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; . . . (2) that the conduct was 'extreme and outrageous' . . .; (3) that the actions of the defendant were the cause of the plaintiff's distress; . . . and (4) that the emotional distress sustained by the plaintiff was 'severe'. . ..." 385 Mass. at 96, 431 N.E.2d 556 (citing Agis v. Howard Johnson Co., 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976)). If each of these elements is proven, the plaintiff can recover for purely emotional suffering unaccompanied by physical injury. Id.

Laudani, 401 B.R. at 41-42 (quoting Regan, 2008 WL 4373001 at *14 n. 13, and citing Johnson v. Town of Nantucket, 550 F.Supp.2d 179, 183 (D. Mass.2008)).[38] See also Alpino v. JPMorgan Chase Bank, Nat'l Assoc., 2011 WL 1564114 at *8; and Bailey v. Wells Fargo Bank, N.A. (In re Bailey), 437 B.R. 721 (Bankr. D. Mass. 2010)(conduct must be extreme and outrageous and beyond all possible bounds of decency and utterly intolerable in a civilized community); and Anilus v. OneWest Bank, FSB, 26 Mass. L. Rpr. 406, 2011 WL 2735052 at *3 (Mass. Super. May 3, 2011) ("To the extent that the plaintiffs are referring to defendant's actions during

---

[38] This Court also observed that 28 U.S.C. § 157(b)(5) precludes this Court from trying a personal injury tort claim.

the foreclosure and loan modification application process, they have not cited any conduct,

beyond the actual process itself, that is extreme and outrageous and beyond the bounds of

human decency. . . .  Although a mortgage foreclosure is typically emotionally distressing,

it is not actionable merely by virtue of the distress it causes.").

In Alpino, the court also observed that an individual is liable for intentional infliction

of emotional distress when he, 'by extreme and outrageous conduct and without privilege,

causes severe emotional distress to another.'" 2011 WL 1564114 at *7 (citing Limone v. U.S.,

579 F.3d 79, 91 (1st Cir.2009) and Agis v. Howard Johnson Co., 371 Mass. 140, 355 N.E.2d

315, 318 (1976)).  The court added:

> Though the defendant may have engaged in some legally cognizable
> wrongdoing, and though the Alpinos have suffered greatly, there is no
> indication that the defendant's actions were extreme and outrageous. "The
> usage of the terms outrageous and extreme have become commonplace in
> today's society, however, as used by the Agis Court they mean more than
> 'annoyances, or even threats and petty oppressions.'" Harvard Univ. v.
> Goldstein, No. 961020, 2000 WL 282537, * 2 (Mass. Super. Ct. Feb. 15, 2000)
> (quoting Conway v. Smerling, 37 Mass.App.Ct. 1, 635 N.E.2d 268, 273 (1994)).
> The plaintiffs have not alleged that the defendant ever asked for more money
> than they actually owed on the mortgage, see Beecy v. Pucciarelli, 387 Mass.
> 589, 441 N.E.2d 1035, 1045 (D.Mass.1982) (finding that attorney's negligent
> actions in bringing a collection action against the wrong defendant did not
> constitute extreme and outrageous conduct), nor do they claim that they have
> been removed from their home in the wake of the wrongful foreclosure. At
> most, the defendant failed to consider the plaintiff for a mortgage
> modification under HAMP and then failed to operate an open and fair
> foreclosure sale.

Alpino, 2011 WL 1564114 at *8.  The court noted that the plaintiffs had not alleged that the

defendant had asked for more money than it was owed and cited a decision in which a suit

against an entity that instituted a collection action against the plaintiff who owed no monies

87

to defendant did not set forth a claim for extreme and outrageous conduct. *See* <u>Beecy v.</u>
<u>Pucciarelli</u>, 387 Mass. 589 (1982).

### 3. Analysis

In light of the authorities discussed above, the Court concludes that the Defendants satisfied their burden as to the absence of any genuine issues of material facts with respect to Count IX. The Plaintiff neither pled nor produced evidence that would create a genuine issue of material facts as to the Defendants' intent to inflict emotional distress. The Debtor did not allege extreme and outrageous conduct on the part of any of the Defendants, although he stated that his distress was extreme and outrageous. The Court recommends entry of summary judgment in favor of all the Defendants with respect to Count IX.

## VI. CONCLUSION

In view of the foregoing, the Court shall recommend to the United States District Court that the Defendants' Motion for Summary Judgment be granted in part and denied in part as follows:

Count I - Wrongful Foreclosure

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all the Defendants, except The Bank of New York Mellon Trust Company National Association, in view of the notice of sale issued by and the foreclosure sale conducted by The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as Successor to JP Morgan Chase Bank, National Association as Trustee POOLING AND SERVICE AGREEMENT Dated as of January 1, 2005 Mortgage Asset-Backed Pass-Through Certificates Series 2005-

RP1.[39]

Count II - Promissory Estoppel

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants, except Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP.

Count III - Chapter 93A

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants.

Count IV - RESPA

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants, except Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP.

Count V - FDCPA

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants, except Bank of America, N.A., successor by merger to BAC Home Loans Servicing, LP.

Count VI - Deceit and Misrepresentation

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants.

Count VII - Negligence

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants.

Count VIII - Accounting

---

[39] To the extent that the Debtor sought to avoid summary judgment on any ground other than the one proscribed by Ibanez, the Court rejected the Debtor's arguments and found that the Defendants established entitlement to summary judgment with respect to the absence of payment defaults and HAMP violations.

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants, except Bank of America, N.A. successor by merger to BAC Home Loans Servicing, LP., and The Bank of New York Mellon Trust Company, NA.

Count IX - Infliction of Emotional Distress

The Court shall recommend that the Defendants' Motion for Summary Judgment be granted in favor of all Defendants.

Based upon the evidence in the summary judgment record, it would appear that Plaintiff is entitled to a declaration that the foreclosure sale conducted by BONY as Trustee is void. Because the Plaintiff did not name The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as Successor to JP Morgan Chase Bank, National Association as Trustee POOLING AND SERVICE AGREEMENT Dated as of January 1, 2005 Mortgage Asset-Backed Pass-Through Certificates Series 2005-RP1 as a defendant, and because of the delay in the resolution of this adversary proceeding, the Court directs the Plaintiff to file a further amended complaint within 14 days of the date of this Memorandum, naming BONY as Trustee as a defendant for purposes of Count I only. *See* Fed. R. Bankr. P. 7016 and Fed. R. Civ. P. 16.

In the event the Plaintiff complies with the above directive, the Court shall recommend entry of summary judgment in favor of the Plaintiff and against BONY and BONY as Trustee on Count I pursuant to Fed. R. Civ. P. 56(f), absent the submission of persuasive evidence or argument by BONY or BONY as Trustee, within 28 days of the date of this Memorandum, that there are genuine issues of material fact or that the Plaintiff is not entitled to judgment as a matter of law against BONY and/or BONY as Trustee. The Court

shall schedule a pretrial conference with respect to Counts II, IV, V and VIII .

By the Court,

*Joan N. Feeney*

Joan N. Feeney
Dated:  July 12, 2012                United States Bankruptcy Judge